a form showing his or her distributive share of the Company items of income, gain, loss deduction or credit.

Each Sharing Member will be subject to tax, and liable for such tax, on his or her distributive share of the Company's taxable income regardless of whether the Sharing Member has received or will receive any distribution of cash from the Company. Thus, in any particular year, a Sharing Member's distributive share of taxable income from the Company (and, possibly, the taxes imposed on that income) could exceed the amount of cash, if any, such Sharing Member is entitled to withdraw from the Company.

Under Section 704 of the Code, a Sharing Member's distributive share of any Company item of income, gain, loss deduction or credit is governed by the Company Operating Agreement unless the allocation provided by the Company Operating Agreement does not have "substantial economic effect." The Regulations promulgated under Section 704(b) of the Code provide certain "safe harbors" with respect to allocations which, under the Regulations, will be deemed to have substantial economic effect. The validity of an allocation which does not satisfy any of the "safe harbors" of these Regulations is determined by taking into account all facts and circumstances relating to the economic arrangements among the Members. If it were determined by the IRS or otherwise that the allocations provided in the Company Operating Agreement with respect to a particular item do not have substantial economic effect, then each Sharing Member's distributive share of that item would be determined for tax purposes in accordance with that Sharing Member's interest in the Company, taking into account all facts and circumstances.

Cash withdrawals, to the extent they do not exceed a Sharing Member's tax basis in his or her interest in the Company, should not result in taxable gain to that Sharing Member, but reduce the tax basis in the Company interest by the amount distributed or withdrawn. Cash withdrawals by a Sharing Member in excess of the basis of his or her Interest is generally taxable either as capital gain or ordinary income, depending on the circumstances.

All securities held by the Company will be marked to market at the end of each accounting period and the net gain or loss from marking to market will be reported as income or loss for financial statement presentation and capital account maintenance purposes. This treatment is inconsistent with the general tax rule applicable to many securities transactions that a transaction does not result in gain or loss until it is closed by an actual sale or other disposition. The divergence between such accounting tax treatment frequently may result in substantial variation between financial statement income (or loss) and taxable income (or loss) reported by the Company.

To the extent that its investments are made in securities denominated in a foreign currency, gain or loss realized by the Company frequently will be affected by the fluctuation in the value of such foreign currencies relative to the value of the dollar. Generally, gains or losses with respect to the Company's investments in common stock of foreign issuers will be taxed as capital gains or losses at the time of disposition of such stock. Under Section 988 of the Code, however, gains and losses of the Company on the acquisition and disposition of foreign currency (e.g., the purchase of foreign currency and subsequent use of the currency to acquire financial asset) will be treated as ordinary income or loss. Moreover, under Section 988, foreign currency gains or losses on disposition of debt securities denominated in a foreign currency attributable to fluctuation in the value of the foreign currency between the date of acquisition of the debt security and the date of disposition may be treated as ordinary income or loss. Similarly, gains or losses attributable to fluctuations in exchange rates that occur between the time the Company accrues interest or other receivables or accrues expenses or other liabilities denominated in a foreign currency and the time the Company actually collects such receivables or pays such liabilities may be treated as ordinary income or ordinary loss.

In the case of "Section 1256 contracts", the Code generally applies a "mark to market" system of taxing unrealized gains and losses on such contracts and otherwise provides for special rules of taxation. A Section 1256 contract includes certain regulated futures contracts, certain foreign currency forward contracts, and certain options contracts.

Under these rules, Section 1256 contracts held by the Company at the end of each taxable year of the Company are treated for Federal income tax purposes as if they were sold by the Company for their fair market value on the last business day of such taxable year. The net gain or loss, if any, resulting from such deemed sales (known as "marking to market"), together with any gain or loss resulting from actual sales of Section 1256 contracts, must be taken into account by the Company in computing its taxable income for such year. If a Section 1256 contract held by the Company at the end of a taxable year is sold in the following year, the amount of any gain or loss realized on such sale will be adjusted to reflect the gain or loss previously taken into account under the "mark to market" rules.

Capital gains and losses from such Section 1256 contracts generally are characterized as short-term capital gains or losses to the extent of 40% thereof and as long-term capital gains or losses to the extent of 60% thereof. Such gains and losses will be taxed under the general rules described above.

The Code allows a taxpayer to elect to offset gains and losses from positions that are part of a "mixed straddle." A "mixed straddle" is any straddle in which one or more but not all positions are Section 1256 contracts. The Company may be eligible to elect to establish one or more mixed straddle accounts for certain of its mixed straddle trading positions.

**Limitations on Losses and Deductions**

The Code provides several limitations on a Sharing Member's ability to deduct his or her share of Company losses and deductions. Certain of these limitations, such as the "passive activity loss" rules, likely will not be applicable to the Company's operations. To the extent that the Company has interest expense, a non-corporate Sharing Member will likely be subject to the "investment interest expense" limitations of Section 163(d) of the Code. Investment interest expense is interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment. The deduction for investment interest expense is limited to net investment income; i.e., the excess of investment income over investment expenses. Excess investment interest expense that is disallowed is not lost permanently but may be carried forward to succeeding years subject to the Section 163(d) limitation. Net capital gain (i.e., net long-term capital gain over net short-term capital loss) on property held for investment is only included in investment income to the extent the taxpayer elects to subject some or all of such gain to taxation at ordinary income tax rates. If some or all of the Company's operations do not constitute a trade or business for purposes of Section 163(d) of the Code, then the Section 163(d) limitations will apply at the partner level with regard to the Company's interest expense. Whether all or any portion of the Company's operations constitutes a trade or business is a question of fact. As the Company's operations may encompass a variety of strategies, the Company cannot predict to what extent its operations will constitute a trade or business. If the Company's operations constitute a trade or business, the position may possibly be taken that the investment interest expense, while subject to the Section 163(d) limitation, is not an itemized deduction.

Section 265 (a)(2) of the Code disallows any deduction for interest paid by a taxpayer on indebtedness incurred or continued for the purpose of purchasing or carrying tax-exempt obligations. The IRS has announced that such purpose will be deemed to exist with respect to indebtedness incurred to finance a "portfolio investment," and that a Sharing Membership interest will be regarded as a "portfolio investment." Therefore, if the Company holds tax-exempt obligations, the IRS might take the position that all or part of the interest paid by a Sharing Member in connection with the purchase of his or her Interest should be viewed as incurred to enable such Sharing Member to continue carrying tax-exempt obligations, and that such Sharing Member should not be allowed to deduct all or a portion of such interest.

Under Section 67 of the Code, for non-corporate partners certain miscellaneous itemized deductions are allowable only to the extent they exceed a "floor" amount equal to 2% of adjusted gross income. If, or to the extent that, the Company's operations do not constitute a trade or business within the meaning of Section 162 and other provision of the Code, a non-corporate Sharing Member's distributive share of the Company investment expenses, other than investment interest expense, would be deductible only as miscellaneous itemized deductions, subject to the 2% floor. Also, if or to the extent that the Company's

operations do not constitute a trade or business, and all or a portion of the incentive allocation to the Manager is re-characterized for tax purposes as an expense of the Company, each non-corporate Sharing Member's share of such expense may be subject to the 2% floor. In addition, the Code restricts the ability of an individual with an adjusted gross income in excess of specified amounts to deduct certain itemized deductions. Under such provision, investment expenses in excess of 2% of adjusted gross income may only be deducted to the extent such excess expenses (along with certain other itemized deductions not including investment interest expense) exceed the lesser of (i) 3% of the excess of the individual's adjusted gross income over the specified amount or (ii) 80% of the amount of such itemized deductions otherwise allowable for the taxable year. Moreover, investment expenses are considered miscellaneous itemized deductions which are not deductible by a non-corporate taxpayer in calculating its alternative minimum tax liability.

Capital losses generally may be deducted only to the extent of capital gains, except for non-corporate taxpayers who are allowed to deduct $3,000 of excess capital losses per year against ordinary income. Corporate taxpayers may carry back unused capital losses for three years, subject to certain limitations, and may carry forward such losses for five years; non-corporate taxpayers may not carry back unused capital losses but may carry forward unused capital losses indefinitely.

**Tax-Exempt Investors**

If the Company derives income which would be considered "unrelated business taxable income" ("UBTI") as defined in Section 512 of the Code if derived directly by a Sharing Member which is an organization exempt from tax under Section 501(a) of the Code or an individual retirement account (an "IRA"), such Sharing Member's allocable share of the Company's income would be subject to tax. A tax-exempt organization which is subject to tax on its allocable share of the Company's unrelated business taxable income, including an IRA, may also be subject to the alternative minimum tax with respect to items of tax preference which enter into the computation of unrelated business taxable income.

UBTI is generally the excess of gross income from any unrelated trade or business conducted by an exempt organization (or by a partnership of which the exempt organization is a member) over the deductions attributable to such trade or business. UBTI generally does not include dividends, interest, annuities, royalties and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the trade or business.

While UBTI itself is taxable, the receipt of UBTI by a tax-exempt entity generally has no effect upon that entity's tax-exempt status or upon the exemption from tax of its other income. However, for certain types of tax-exempt entities, the receipt of any UBTI may have extremely adverse consequences. In particular, for charitable remainder trusts (defined under Section 664 of the Code), the receipt of any taxable income from UBTI during a taxable year will result in the taxation of all of the trust's income from all sources for such year.

A tax-exempt organization under Section 501 (a) of the Code (and an IRA) also includes in its UBTI its "unrelated debt-financed income" (and its allocable share of the "unrelated debt-financed income" of any partnership in which it invests) pursuant to Section 514 of the Code. In general, unrelated debt-financed income consists of: (i) income derived by a tax-exempt organization (directly or through a partnership) from income producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year; and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness." Such income and gains derived by a tax-exempt organization from the ownership and sale of debt-financed property are taxable in the proportion to which such property is financed by "acquisition indebtedness" during the relevant period of time.

The Company is expected to incur indebtedness and a Sharing Member which is a tax-exempt organization (or an IRA) should expect to be subject to tax on the proportion of its distributive share of the Company's income which is unrelated debt-financed income. In addition, to the extent a tax-exempt organization borrows money to finance its investment in the Company, such organization would be

subject to tax on the portion of its income which is unrelated debt-financed income even though such income may constitute an item otherwise excludable from UBTI, such as dividends.

**Other Taxes**

Members may be subject to other taxes, such as the alternative minimum tax, state and local income taxes, and estate, inheritance or intangible property taxes that may be imposed by various jurisdictions. Each prospective investor should consider the potential consequences of such taxes on an investment in the Company. It is the responsibility of each prospective investor to become satisfied as to the legal and tax consequences of an investment in the Company under state law, including the laws of the state(s) of his or her domicile and residence, by obtaining advice from his or her own tax advisors, and to file all appropriate tax returns that may be required.

**Tax Elections; Returns; Tax Audits**

The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death) provided that a partnership election has been made pursuant to Section 754. Under the Company Operating Agreement, the Manager, in its sole discretion, may cause the Company to make such an election. Any such election, once made, cannot be revoked without the IRS's consent.

If the Company is treated as a securities trader for federal income tax purposes, then the Company may elect to "mark to market" its securities at the end of each taxable year, in which case such securities would be treated for federal income tax purposes as though sold for fair market value on the last business day of such taxable year. Such an election would apply to the taxable year for which made and all subsequent taxable years unless revoked with the consent of the Internal Revenue service. If the Company were to make such an election, then a portion of the Company's gains and losses would be considered ordinary income or loss, rather than capital gain or loss. Since capital losses generally may be deducted only against capital gains for federal income tax purposes, a Sharing Member may be unable to deduct capital losses realized from other investments and transactions in a taxable year against his share of the Company's income.

The Manager will decide how to report partnership items on the Company's tax returns. Since the Company may engage in transactions whose treatment for tax purposes is not clear, there is a risk that a claim of tax liability could be asserted against the Company or its Members. If the income tax returns of the Company are audited by the IRS, then the tax treatment of Company income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Members. The Manager, as the "Tax Matters Partner", has considerable authority to make decisions affecting the tax treatment and procedural rights of all Members. In addition, the Tax Matters Partner has the authority to bind certain Members to settlement agreements and the right on behalf of all Members to extend the statute of limitations relating to the Members' tax liabilities with respect to Partnership items.

**Other Matters**

A Sharing Member may, with the consent of the Manager, contribute securities to the capital of the Company. However, a Sharing Member's contribution of appreciated securities may be taxable under Section 721 (b) of the Code.

It is possible that the Company and or certain transactions executed by the Company would be subject to tax shelter disclosure registration and listing requirements under applicable U.S. tax laws and regulations.

## Special Considerations for Members who are not U.S. Citizens or Residents

The Company does not intend to conduct a trade or business in the United States or to invest in securities the income from which is treated for U.S. federal income tax purposes as arising from a U.S. trade or business. Assuming that the Company complies with certain rules and procedures pertaining to the conduct of its affairs (including the assumptions indicated above), it is anticipated that the income of the Sharing Members who are not U.S. citizens or residents ("Offshore Investors") will not be subject to regular U.S. federal income taxes on the basis of net income.

## Foreign Tax Issues

Offshore Investors will be directly or indirectly subject to U.S. withholding taxes on some of their income, including fixed or determinable annual or periodical ("FDAP") income, such as dividend income, considered to be from U.S. sources. Generally, capital gains and qualified interest, such as portfolio interest (as defined in Section 871(h) of the Code), should not be subject to U.S. withholding tax. The U.S. withholding tax rate is generally 30%. Although capital gains from the sale of securities should generally not be subject to U.S. withholding tax, the sale of certain securities classified as United States real property interests within the meaning of Section 897 of the Code may be subject to U.S. income and withholding taxes. For example, if the Company owns greater than 5% of the stock of a U.S. corporation which owns significant United States real property interests (such as certain U.S. utilities), sales of such stock may be subject to U.S. income and withholding tax.

## State Taxation

In addition to the federal income tax consequences described above, prospective investors should consider potential state tax consequences of an investment in the Company. No attempt is made herein to provide a discussion of such state tax consequences. State laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Company generally will be required to be included in determining his or her reportable income for state tax purposes in the jurisdiction in which he or she is a resident. Each prospective investor must consult his or her own tax advisors regarding such state tax consequences.

## Future Tax Legislation

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or guidance by the IRS, or judicial decisions may adversely affect the federal income tax aspects of an investment in the Company, with or without advance notice, and retroactively or prospectively.

(BALANCE OF PAGE LEFT BLANK INTENTIONALLY)

**EXHIBIT A**

**OPERATING AGREEMENT
OF
WINEX INVESTMENTS, LLC**

**OPERATING AGREEMENT OF WINEX INVESTMENTS, LLC**

This Operating Agreement of Winex Investments, LLC is dated as of March 7, 2007 by the sole member Diversity Management, Inc. a Wyoming corporation. This Agreement recognizes that: (i) two class of Units have been created, namely, Sharing Units and Voting Units; (ii) the Company has authorized Sharing Units to be sold and that persons that purchase such Units be added as Members; and (iii) the Company is authorized to participate, either directly or indirectly, in certain asset allocation projects.

## 1. ORGANIZATION.

1.1    Formation. On or about January 30, 2007, Articles of Organization were filed in the office of the Secretary of State of Wyoming in accordance with and pursuant to the Act.

1.2    Name and Place of Business. The name of the Company shall be Winex Investments, LLC and its principal place of business shall be 2333 State Street, Suite 102 Carlsbad, CA 92008. The Manager may change such name, change such place of business or establish additional places of business of the Company as the Manager may determine to be necessary or desirable.

1.3    Business and Purpose of the Company. The Company's business and purpose shall consist solely of providing capital to be professionally managed by Trading Advisors and other such financial experts as may be identified from time to time in the sole discretion of the Manager (singularly the "Project" collectively the "Projects"), and such activities as are necessary or incidental in connection therewith. The Company shall not engage in any business or own any assets other than those related to the Projects.

1.4    Term.  The term of the Company shall terminate as provided in Section 12 of this Agreement.

1.5    Required Filings. The Manager shall execute, acknowledge, file, record and/or publish such certificates and documents, as may be required by this Agreement or by law in connection with the formation and operation of the Company.

1.6    Registered Office and Registered Agent. The Company's initial registered office and initial registered agent shall be as provided in the Articles of Organization. The registered office and registered agent may be changed from time to time by the Manager by filing the address of the new registered office and/or the name of the new registered agent pursuant to the Act.

1.7    Certain Transactions. Any Manager, Member, Assignee, or any Affiliate, or any shareholder, officer, director, employee, partner, member or any person owning an interest therein, may engage in or possess an interest in any other business or venture of any nature or description, whether or not competitive with the Company including, but not limited to, the acquisition, syndication, ownership, financing. leasing, operation, maintenance, management, brokerage, construction and development of property similar to the Projects and no Manager, Member or other person or entity shall have any interest in such other business or venture by reason of their interest in the Company.

2.    **Definitions.** Except as defined within the context of this Agreement, definitions for this Agreement are set forth on Exhibit A and are incorporated herein.

3.    **Capitalization and Financing**.

3.1    Members' Capital Contributions.

3.1.1    Units. All ownership interests in the Company shall be denominated in Units. The Company hereby authorizes and may issue up to fifty thousand (50,000) Sharing Units and up to one thousand (1000) Voting Units. The aggregate amount of Sharing Units that may be issued may not exceed a value of more than fifty million dollars ($50,000,000). Each Unit will have the rights and obligations set forth in this Operating Agreement. No Units will be registered upon any national security exchange, regional or local exchange or interdealer quotation system that regularly disseminates firm buy or sell quotations by brokers or dealers without the Majority Approval of the Voting Members.

3.1.2    Initial Member. Diversity Management, Inc. the initial member of the Company contributed one hundred dollars ($100) to the Company and received 500 Voting Units.

3.1.3    Additional Members. Subject to Section 3.1.1 of this Agreement, the Company is hereby authorized to sell and issue not less than one million dollars ($1,000,000) of an aggregate of the

42

Sharing Units and not more than fifty million dollars ($50,000,000) 50,000 Sharing Units at a purchase price of one thousand dollars ($1,000) per Sharing Unit. The purchasers of the Sharing Units shall be admitted as Members of the Company. The minimum purchase per Member shall be fifty (50) Sharing Units, except that the Manager may, in its sole discretion, sell and issue fractional Sharing Units. The Offering shall terminate on the Offering Termination Date. In no event may Benefit Plan Investors acquire twentyfive percent (25%) or more of the total value of Units.

    3.1.4    Payment of Purchase Price.    The purchase price of each Sharing Unit shall be paid in full in cash at the time of execution of the Subscription Agreement. Payment of the purchase price for a Unit shall constitute the Member's initial Capital Contribution.

    3.1.5    Subscription Agreement. Each person desiring to acquire Sharing Units and become a Member shall tender to the Company a Subscription Agreement for the number of Sharing Units desired, together with the correct Subscription Payment of the Units so subscribed. The  Company shall accept or reject each Subscription Agreement within 30 days after the Company receives the same (and the failure by the Company to reject a Subscription Agreement within said thirty (30) days shall constitute an acceptance thereof). Subject to Section 3.1.7, upon the acceptance of a Subscription Agreement, the accompanying Subscription Payment shall become a Capital Contribution by such subscriber.

    3.1.6    Depository Account. After acceptance of any tendered Subscription Agreement by the Company, the accompanying Subscription Payment shall be placed in an interest bearing account ("Depository Account") at Wells Fargo Bank, San Diego, California, and held there until such time as Subscription Payments for at least one thousand (1,000) Sharing Units have been received and accepted by the Manager and deposited in the Depository Account. Upon the receipt and acceptance of no less than one thousand (1,000) Sharing Units, funds in the Depository Account shall be released to the Company. After the initial funds have been received by the Company for the first one thousand (1,000) Sharing Units, any additional Subscription Payments received shall be sent directly to and retained by the Company. Purchasers of Sharing Units shall be admitted as Members of the Company on the first day of the calendar month following the month in which the Company accepts such subscriber's subscription unless admitted earlier by the Manager. All subscriptions shall be accepted or rejected by the Company within thirty (30) days of their actual receipt by the Company. If rejected, all subscription monies shall be returned to the subscriber.

    3.1.7    Cancellation of Offering.    If the Company has not accepted Subscription Payments for at least one thousand (1,0000) Sharing. Units on or before May 1, 2007, (unless extended until July 1, 2007 in the sole and absolute discretion of the Manager) the Offering shall be canceled and all Subscription Payments received shall be promptly refunded to the subscribers.

    3.1.8    Interest from Depository Account. Within forty-five (45) days after any Subscription Payment is released from the Depository Account and returned to the subscriber upon cancellation of the Offering as provided in Section 3.1.7, an allocable share of the interest earned by the Depository Account while the Subscription Payment was deposited therein shall be paid to the subscriber, based on the actual number of days such Subscription Payment was deposited in the Depository Account and the actual amount of interest earned during such period on funds in the Depository Account. Otherwise, interest earned on funds in the Depository Account will be distributed to the Company upon release of funds to the Company.

    3.1.9    Admission of a Member. To the extent required by law, the Manager shall amend this Agreement and take such other action, as the Manager deems necessary or appropriate, promptly after receipt of the Members' Capital Contributions to the Company to reflect the admission of those persons to the Company as a Member.

    3.1.10  Liabilities of Members. Except as specifically provided in this Agreement, neither the Manager nor any Member shall be required to make any additional contributions to the Company and no Manager or Member shall be liable for the debts, liabilities, contracts, or any other obligations of the Company, nor shall the Manager or the Members be required to lend any funds to the Company or to repay to the Company, any Member, or any creditor of the Company any portion or all of any deficit balance in a Member's Capital Account.

    3.2    Manager Loans. The Manager or Affiliates may, but will have no obligation to, make loans to the Company to pay Company operating expenses or for any other reason. Any such loan shall bear interest at an interest rate reasonably determined by the Manager and provide for the payment of

principal and any accrued but unpaid interest in accordance with the terms of the promissory note evidencing such loan, but in no event later than dissolution of the Company.

3.3     <u>Company Loans.</u> The Company may obtain, in the sole and absolute discretion of the Manager, loans to acquire or refinance a Project or for any other reason related to the Company.

3.4     <u>Maintenance of Capital Accounts</u>. The Company shall establish and maintain Capital Accounts for each Member and Assignee as hereinafter provided in this Agreement and the Exhibits attached hereto.

**4.**     <u>**Allocation of Tax Items.**</u>

4.1     <u>Allocation of Net Income and Net Loss</u>. For each calendar month, the Net Income and Net Loss of the Company shall be allocated in accordance with this Section 4.1:

    4.1.1     <u>Net Income Allocations</u>. After giving effect to the tax allocations set forth in Exhibit B and incorporated herein, Net Income for any calendar month shall be allocated as follows:

        (a) First, among the Members and Assignees in proportion to and to the extent of Net Loss allocated to the Members and Assignees pursuant to Section 4.1.2(b) until the aggregate Net Income allocated to the Members pursuant to this Section 4.1.1(a) for such calendar month and all previous calendar months is equal to the aggregate Net Loss allocated to the Members pursuant to Section 4.1.2(b) for all previous calendar months;

        (b) Second, among the holders of Sharing Units in proportion to their Units an amount, when combined with prior allocations pursuant to this Section 4.1.1(b), equals eighty percent (80%) of the Company's monthly Net Cash Flow;

        (c) Third, among the holders of the Voting Units in proportion to their Units an amount, when combined with prior allocations pursuant to this Section 4.1.1(b), equals twenty percent (20%) of the Company's monthly Net Cash Flow.

    4.1.2     <u>Net Loss Allocations</u>. After giving effect to the tax allocations provisions set forth in Exhibit B and incorporated herein, Net Loss for any calendar month shall be allocated as follows:

        (a)     First, among the Members or Assignees in proportion to and to the extent of Net Income allocated to the Members or Assignees under Section 4.1.1(b) until the aggregate Net Loss allocated pursuant to this Section 4.1.2(a) for such calendar month and all previous calendar months equals the aggregate Net Income allocated to the Members pursuant to Section 4.1.1(b) for all previous calendar months; provided that Net Loss shall not be allocated to any Member to the extent such allocation would cause such Member or Assignee to have an Adjusted Capital Account Deficit at the end of a calendar month; and

        (b)     Second, to the Members and Assignees in proportion to their Units.

4.2     <u>Consent of Members</u>. The allocation methods of Net Income and Net Loss are hereby expressly consented to by each Member as a condition of becoming a Member.

4.3     <u>Withholding Obligations</u>.

    4.3.1     If the Company is required (as determined in good faith by the Manager) to make a payment ("Tax Payment") with respect to any Member to discharge any legal obligation of the Company or the Manager to make payments to any governmental authority with respect to any federal, foreign, state or local tax liability of such Member arising as a result of such Member's interest in the Company, then, notwithstanding any other provision of this Agreement to the contrary, the amount of any such Tax Payment shall be deemed to be a loan by the Company to such Member, which loan shall bear interest at the prime rate (as published from time to time by the Wall Street Journal) plus three percent (3%) and be payable upon demand or by offset to any Distribution which otherwise would be made to such Member.

    4.3.2     If and to the extent the Company is required to make any Tax Payment with respect to any Member, or elects to make payment on any loan to a Member offsetting a Distribution to a Member, either (i) such Member's proportionate share of such Distribution shall be reduced by the amount of such Tax Payment or payment of the loan to a Member, or (ii) such Member shall pay to the Company prior to such Distribution an amount of cash equal to such Tax Payment or payment of the loan to the Member. In the event a portion of a Distribution in kind is retained by the Company pursuant to clause (i) above, such retained property may, in the discretion of the Manager, either (A) be distributed to the other Members, or (B) be sold by the Company to generate the cash necessary to satisfy such Tax Payment. If the property is sold, then for purposes of income tax allocations only under the Agreement, any gain or loss from such sale or exchange shall be allocated to the Member to whom the Tax Payment

relates. If the property is sold at a gain, and the Company is required to make any Tax Payment on such gain, the Member to whom the gain is allocated shall pay the Company prior to the due date of Tax Payment an amount of cash equal to such Tax Payment.

4.3.3    The Manager shall be entitled to hold back any Distribution to any Member to the extent the Manager believes in good faith that a Tax Payment will be required with respect to such Member in the future and the Manager believes that there will not be sufficient subsequent Distributions to make such Tax Payment.

**5. Distributions.**

5.1    Distributions of Net Cash Flow. The Company shall as soon as reasonably practical, make Distributions of Net Cash Flow to the Members or Assignees in the following manner and order of priority:

5.11    (a) First, among the Members and Assignees in proportion to and to the extent of Net Loss allocated to the Members and Assignees pursuant to Section 4.1.2(b) until the aggregate Net Income allocated to the Members pursuant to this Section 5.1.1(a) for such calendar month and all previous calendar months is equal to the aggregate Net Loss allocated to the Members pursuant to Section 4.1.2(b) for all previous calendar months;

(b) Second, among the holders of Sharing Units in proportion to their Units an amount, when combined with prior allocations pursuant to this Section 5.1.1(b), equals eighty percent (80%) of the Company's monthly Net Cash Flow;

(c) Third, among the holders of the Voting Units in proportion to their Units an amount, when combined with prior allocations pursuant to this Section 5.1.1(b), equals twenty percent (20%) of the Company's monthly Net Cash Flow.

5.2    Liquidating Distributions. After payment of all Company debts and liabilities as provided in Section 13.3, any remaining proceeds shall be distributed to each Member or Assignee in accordance with Section 5.1 above and in accordance with their respective positive Capital Account balances, after adjustment for Net Income and Net Loss recognized by the Company in connection with the dissolution. The time and method of making Distributions described in this Section 5 shall comply with Treasury Regulations 1.704-1(b) or, if no such regulations apply, shall be made as soon as possible after dissolution.

5.3    Withholding; Amounts Withheld Treated as Distributions. The Company is authorized to withhold from Distributions, or with respect to allocations or payments, to Members and to pay over to the appropriate federal, state or local governmental authority any amounts required to be withheld pursuant to the I.R.C. or provisions of applicable state or local law. All amounts withheld pursuant to the preceding sentence in connection with any payment, Distribution or allocation to any Member shall be treated as Distributions to such Member pursuant to this Section 5.

**6.    Compensation to the Manager and its Affiliates.**

6.1 Manager's and Affiliates' Compensation. In addition to costs and expenses as provided in Section 6.2 below, the Manager and its Affiliates shall receive certain fees as disclosed in the memorandum as compensation from the Company for services rendered or to be rendered.

6.2    Company Expenses.

6.2.1    Expenses. All of the Company's expenses shall be billed directly to and paid by the Company. The Company shall reimburse the Manager and its Affiliates for (i) all Organization and Offering Expenses in an amount specified in the Memorandum, and (ii) all costs and expenses, other than Organization and Offering Expenses, that the Manager and its Affiliates incur on behalf of, or in the management and operation of the business of, the Company and the selection and acquisition of Projects, whether or not acquired, including, but not limited to, legal and accounting costs and expenses, telephone, travel, entertainment, and other direct general and administrative expenses, costs of appraisals, nonrefundable option payments on property not acquired, title insurance, and other costs or expenses that are necessary or appropriate to the conduct of the Company's business and directly allocable to the Company or the business of the Company.

6.2.2    Manager Overhead. Except as set forth in this Section 6, the Manager and its Affiliates shall not be reimbursed for general non-direct overhead expenses incurred in connection with the Company, including but not limited to rent, depreciation, utilities, or capital equipment.

7.    **Authority and Responsibilities of the Manager.**

7.1    _Management._ The Manager shall manage the business and affairs of the Company. Except as otherwise set forth in this Agreement, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

7.2    _Number, Tenure and Qualifications._ The Company shall have one Manager, which shall be Diversity Management, Inc. ("DMI") . The Manager shall hold office until such Manager is removed or withdraws or resigns as provided herein.

7.3    _Manager Authority._ The Manager shall have all authority, rights and powers conferred by law (subject only to Section 7.4) and those required or appropriate to the management of the Company's business, which, by way of illustration but not by way of limitation, shall include the right, authority and power to cause the Company to:

7.3.1    Take all actions as the buyer of all or an undivided interest in Projects;

7.3.2    Acquire, hold, develop, alter, expand, lease, rent, operate, sell, exchange, subdivide and otherwise dispose of Projects;

7.3.3    Borrow money, and, if security is required therefore, to pledge or mortgage or subject Projects to any security device, to obtain replacements of any mortgage or other security device and to prepay, in whole or in part, refinance, increase, modify, consolidate, or extend any mortgage or other security device. All of the foregoing shall be on such terms and in such amounts and from such persons as the Manager, in its sole discretion, deems to be in the best interest of the Company;

7.3.4    Place record title to, or the right to use, Projects in the name or names of a nominee or nominees for any purpose convenient or beneficial to the Company;

7.3.5    Enter into such contracts and agreements as the Manager determines to be reasonably necessary or appropriate in connection with the Company's business and purpose (including other contracts with the Manager, Members, or their Affiliates), and any contract of insurance that the Manager deems necessary or appropriate for the protection of the Company and the Manager, including errors and omissions insurance, for the conservation of Company assets, or for any purpose convenient or beneficial to the Company;

7.3.6    Employ persons, who may be Affiliates of the Manager or Members, in the operation and management of the business of the Company;

7.3.7    Prepare or cause to be prepared reports, statements, and other relevant information for distribution to the Members;

7.3.8    Open accounts and deposits and maintain funds in the name of the Company in banks, savings and loan associations, "money market" mutual funds and such other investments as the Manager may deem in its sole discretion to be necessary or desirable;

7.3.9    Cause the Company to make or revoke any of the elections referred to in the Code (the Manager shall have no obligation to make any such elections);

7.3.10    Select as its accounting year a calendar or fiscal year as may be approved by the Internal Revenue Service (the Company initially intends to adopt the calendar year);

7.3.11    Determine the appropriate accounting method or methods to be used by the Company;

7.3.12 In addition to any amendments otherwise authorized herein, amend this Agreement without any action on the part of the Members by special or general power of attorney or otherwise to:

(a)    Add to the representations, duties, services or obligations of the Manager or its Affiliates, for the benefit of the Members;

(b)    Cure any ambiguity or mistake, to correct or supplement any provision herein that may be inconsistent with any other provision herein, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the provisions of this Agreement;

(c)    Delete or add any provision of this Agreement required to be so deleted or added for the benefit of the Members by the staff of the Securities and Exchange Commission or by a state "Blue Sky" Commissioner or similar official;

(d)    Amend this Agreement to reflect the addition or substitution of Members or the reduction of the Capital Accounts upon the return of capital to the Members;

46

(e)    Minimize the adverse impact of, or comply with, any final regulation of the United States Department of Labor, or other federal agency having jurisdiction, defining "plan assets" for ERISA purposes;

(f)    Reconstitute the Company under the laws of another state if beneficial;

(g)    Execute, acknowledge and deliver any and all instruments to effectuate the foregoing, including the execution, acknowledgment and delivery of any such instrument by the attorney-in-fact for the Manager under a special or limited power of attorney, and to take all such actions in connection therewith as the Manager shall deem necessary or appropriate with the signature of the Manager acting alone; and

(h)    Make any changes to this Agreement as requested or required by a lender which may be required to obtain financing.

7.3.13    Require in any Company contract that the Manager shall not have any personal liability, but that the person or entity contracting with the Company is to look solely to the Company and its assets for satisfaction;

7.3.14 Lease personal property for use by the Company;

7.3.15    Establish Reserves from cash flow in such amounts and in such investments as the Manager in its sole discretion may deem appropriate;

7.3.16    Temporarily invest the proceeds from the sale of Units in short-term, highly liquid investments;

7.3.17    Represent the Company and the Members as "tax matters partner" within the meaning of the Code in discussions with the Internal Revenue Service regarding the tax treatment of items of Company income, loss, deduction or credit, or any other matter reflected in the Company's returns, and, if deemed in the best interest of the Members, to agree to final Company administrative adjustments or file a petition for a readjustment of the Company items in question with the applicable court;

7.3.18    Subject to Section 3 of this Agreement, offer and sell Units through any appropriately authorized Affiliate, or appropriately authorized nonaffiliate, and to employ appropriately authorized personnel, agents and dealers for such purpose;

7.3.19    Subject to Section 10.8 of this Agreement, redeem or repurchase Units on behalf of the Company;

7.3.20    Hold an election for a successor Manager before the resignation, expulsion or dissolution of the Manager;

7.3.21    Initiate, settle and defend legal actions on behalf of the Company;

7.3.22    Admit itself as a Member;

7.3.23    Take all actions and make any decision under other agreements to which the Company is a party;

7.3.24    Enter into any transaction with any partnership or joint-venture;

7.3.25    Merge or combine the Company or "roll-up" the Company into a partnership, limited liability company or other entity with a Majority Vote of the Voting Members;

7.3.26    Place all or a portion of a Project in a single purpose or bankruptcy remote entity, or otherwise structure or restructure the Company to accommodate any financing for all or a portion of any Project;

7.3.27 Perform any and all other acts which the Manager is obligated to perform hereunder;

7.3.28 Execute, acknowledge and deliver any and all instruments to effectuate the foregoing and all transactions and actions described in, or contemplated by, the Memorandum, and take all such actions in connection therewith as the Manager may deem necessary or appropriate. The Manager may, on behalf and in the name of the Company, execute any and all documents or instruments; and

7.4    Restrictions on Manager's Authority. Neither the Manager nor any Affiliates shall have authority, without a Majority Vote of the Voting Members, to:

7.4.1    Enter into contracts between the Company and the Manager or its Affiliate that would bind the Company after the expulsion, or other cessation to exist of the Manager;

7.4.2    Use or permit any other person to use Company funds or assets in any manner, except for the benefit of the Company, in the Manager's discretion;

47

7.4.3    Sell or lease to the Company any real property in which the Manager, or any of their Affiliate has any interest;

7.4.4    Admit another person or entity as the Manager, except as provided in this Agreement; and

7.4.5    Directly or indirectly pay or award any finder's fees, commissions or other compensation to any person engaged by a potential investor for investment advice as an inducement to such advisor to advise the purchaser regarding the purchase of Units; provided, however, that the Manager shall not be prohibited from paying underwriting or marketing commissions, or finder's or referral fees to registered broker-dealers or other properly authorized persons for their services in marketing Units as provided for in this Agreement.

7.5    Responsibilities of the Manager. The Manager shall:

7.5.1    Have a fiduciary responsibility for the safekeeping and use of all the funds and assets of the Company;

7.5.2    Devote such of its time and business efforts to the business of the Company as it shall in its discretion, exercised in good faith, determine to be necessary to conduct the business of the Company for the benefit of the Company and the Members;

7.5.3    File and publish all certificates, statements, or other instruments required by law for formation, qualification, and operation of the Company and for the conduct of its business in all appropriate jurisdictions;

7.5.4    Cause the Company to be protected by public liability, property damage and other insurance determined by the Manager in its discretion to be appropriate to the business of the Company;

7.5.5    At all times use its best efforts to meet applicable requirements for the Company to be taxed as a partnership and not as an association taxable as a corporation; and

7.5.6    Do all things necessary to reflect the admission of Members not later than ninety (90) days after the date of admission or substitution.

7.6    Administration of Company. So long as it is the Manager and the provisions of this Agreement for compensation and reimbursement of expenses of the Manager are observed, the Manager shall have the responsibility of providing continuing administrative and executive support, advice, consultation, analysis and supervision with respect to the functions of the Company, including decisions regarding the sale, financing or other disposition of the Projects, and compliance with federal, state and local regulatory requirements and procedures. In this regard, the Manager may retain the services of such Affiliates or unaffiliated parties as the Manager may deem appropriate to provide management and financial consultation and advice, and may enter into agreements for the management and operation of Company assets.

7.7    Tax Matters Member. The Members hereby appoint DMI to act as the "tax matters partner."

7.8    Indemnification of Manner.    To the extent allowed by law, the Manager, its shareholders, Affiliates, officers, directors, partners, manager, members, employees, agents and assigns, shall not be liable for, and shall be indemnified and held harmless (to the extent of the Company's assets) from, any loss or damage incurred by them, the Company or the Members in connection with the business of the Company, including costs and reasonable attorneys' fees and any amounts expended in the settlement of any claims of loss or damage resulting from any act or omission performed or omitted in good faith, which shall not constitute gross negligence or willful misconduct, pursuant to the authority granted, to promote the interests of the Company. Moreover, the Manager shall not be liable to the Company or the Members because any taxing authorities disallow or adjust any deductions or credits in the Company income tax returns.

7.9    No Personal Liability for Return of Capital. The Manager shall not be personally liable or responsible for the return or repayment of all or any portion of the Capital Contribution of any Member or of any loan made by any Member to the Company; it being expressly understood that any such return of capital or repayment of any loan shall be made solely from the assets (which shall not include any right of contribution from any Member) of the Company.

7.10    Authority as to Third Persons.

7.10.1    No third party dealing with the Company shall be required to investigate the authority of the Manager or secure the approval or confirmation by any Member of any act of the Manager in connection with the Company business. No purchaser of any property or interest owned by the

Company shall be required to determine the right to sell or the authority of the Manager to sign and deliver any instrument of transfer on behalf of the Company, or to see to the application or distribution of revenues or proceeds paid or credited in connection therewith.

7.10.2    The Manager shall have full authority to execute on behalf of the Company any and all agreements, contracts, conveyances, deeds, mortgages and other instruments, and the execution thereof by the Manager, executing on behalf of the Company shall be the only execution necessary to bind the Company thereto. No signature of any Member shall be required.

7.10.3 The Manager shall have the right by separate instrument or document to authorize one or more individuals or entities to execute leases and lease-related documents on behalf of the Company and any leases and documents executed by such agent shall be binding upon the Company as if executed by the Manager.

7.11    Certain Prohibited Activities. Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern: (1) the Company shall not hold any other assets except the Projects and any assets directly related thereto; or (2) engage in any business other than participating, either directly or indirectly in the Projects.

7.12    Manager or Affiliates Dealing with Company. Unless otherwise specifically authorized in this Agreement, the Manager or any of its Affiliates shall have the right to contract or otherwise deal with the Company for the sale of goods or services, either if (i) the compensation paid or promised for such goods or services is reasonable and is paid only for goods or services actually furnished to the Company, (ii) the goods or services to be furnished shall be reasonable for and necessary to the Company, and (iii) the terms for the furnishing of such goods or services shall be at least as favorable to the Company as would be obtainable in an arms length transaction. Any contract with the Manager or any of its Affiliates for such goods or services shall be in writing. Neither the Company nor any of its Affiliates shall, by the making of a lump sum payment to any other person for ultimate disbursement to the Manager or any of its Affiliates, circumvent the provisions herein. The Manager may not receive any rebate, kick-back or give-up in connection with the operation of the Company. The Manager shall not, directly or indirectly, pay or award any finders' fees, commission or other compensation to any person engaged by a potential Member for investment advice as an inducement to such person to advise the potential Member to buy Units.

7.13    Officers. If deemed desirable in its sole discretion, the Manager shall have authority to designate officers of the Company ("Officers") to act on behalf of the Company. The Officers of the Company shall be designated by the Manager and shall consist of at least a President and a Secretary. Any number of offices may be held by the same person. The Manager shall choose the President and Secretary. The Manager may appoint such other Officers and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Manager. The President or any other Officer authorized by the Manager shall have the authority to execute documents on behalf of the Company. Subject to Section 6 hereof, the salaries of all Officers and agents of the Company shall be fixed by or in the manner prescribed by the Manager. The Officers of the Company shall hold office until their successors are chosen and qualified. The Manager may remove any Officer at any time, with or without cause. The Manager shall fill any vacancy occurring in any office of the Company.

7.13.1    President.  The President shall be the chief executive officer of the Company and shall be responsible for seeing that all orders and resolutions of the Manager are carried into effect. The President shall perform such other duties as may be prescribed from time to time by the Manager, under whose supervision the President shall serve.

7.13.2    Chief Operating Officer. In the absence of the President, or in the event of his inability or refusal to act, the Chief Operating Officer shall perform the duties of the President, and when so acting shall have all the powers of and be subject to all the restrictions upon the President. The Chief Operating Officer shall perform such other duties as may be prescribed from time to time by the Manager, under whose supervision the Chief Operating Officer shall serve.

7.13.3    Secretary.  The Secretary shall be responsible for maintaining records for the Company. The Secretary shall attend all meetings and record all the proceedings of the meetings, if any, of the Members and shall perform like duties for the standing committees when required. The Secretary shall give, or shall cause to be given, notice of all meetings, if any, of the Members and shall perform

such other duties as may be prescribed from time to time by the Manager, under whose supervision the Secretary shall serve.

7.13.4   Officers as Agents. The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Manager not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business and the actions of the Officers taken in accordance with such powers shall bind the Company.

7.13.5   Duties of Officers. Except to the extent otherwise provided herein, each Officer shall have a fiduciary duty of loyalty and care similar to that of officers of business corporations.

7.13.6   Indemnification and Limitation of Liability. Each Officer shall have all rights to indemnification and limitations of liability equal to those afforded to the Manager under this Agreement, including, without limitation, Sections 7.8 and 7.9 hereof, under the Act, and/or applicable law.

8.      **Rights, Authority and Voting of the Members.**

8.1      Members Are Not Agents. Pursuant to Section 7 and the Articles of Organization, the management of the Company is vested in the Manager. No Member, acting solely in the capacity of a Member, is an agent of the Company nor can any Member in such capacity bind nor execute any instrument on behalf of the Company.

8.2      Voting by the Voting Members. Each Voting Member shall have one vote for each Voting Unit they own. Unless otherwise specifically required in this Agreement, matters upon which the Voting Members may vote shall require a Majority Vote to be approved. In addition to other provisions in this Agreement, Voting Members shall have the right to vote upon the following matters:

8.2.1   Removal of the Manager as provided in this Agreement;

8.2.2   Appointment of the successor Manager;

8.2.3   Except as otherwise provided herein, amendment of this Agreement;

8.2.4   Except as otherwise provided herein, any merger or combination of the Company or roll-up of the Company;

8.2.5   Dissolution and winding up of the Company as set forth in Section 13.1; and

8.2.6   Sale of all or substantially all of the assets of the Company.

8.3      Voting by the Sharing Members. Each Sharing Member shall have one vote for each Unit they own, and a fractional vote for each fractional Unit they own. Unless otherwise specifically required in this Agreement, matters upon which Sharing Members may vote shall require a Majority Vote to be approved. Sharing Members shall have the right to vote upon the following matters:

8.3.1   Sale, assignment, or transfer of fifty percent (50%) or more of the Voting Units owned by DMI, or any successor owner of such Units;

8.3.2   Extension of the termination date of the Company beyond December 31, 2031, allowed by Section 12.1.4; and

8.3.3   Require an audit of the financial activities of the liquidation and dissolution of the Company by an independent certified accounting firm to be selected by the Manager and the expense of which shall be paid by the Company.

8.4      Meetings of the Members. The Manager may at any time call for a meeting of the Members, or call for a vote without a meeting, on matters on which the Members are entitled to vote, and shall call for such a meeting (but not a vote without a meeting) following receipt of a written request therefore of Members holding more than twenty-five (25) percent of the Units entitled to vote as of the record date. Within twenty (20) days after receipt of such request, the Manager shall notify all Members of record on the record date of the Company meeting.

8.4.1   Notice. Written notice of each meeting shall be given to each Member entitled to vote, either personally or by mail or other means of written communication, charges prepaid, addressed to such Member at his or her address appearing on the books of the Company or given by him or her to the Company for the purpose of notice or, if no such address appears or is given, at the principal executive office of the Company, or by publication of notice at least once in a newspaper of general circulation in the county in which such office is located. All such notices shall be sent not less than ten (10), nor more than sixty (60), days before such meeting. The notice shall specify the place, date and hour of the meeting and the general nature of business to be transacted, and no other business shall be transacted at the meeting.

8.4.2   Adjourned Meeting and Notice Thereof.   When a Members' meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the

Company may transact any business that might have been transacted at the original meeting. If the adjournment is for more than forty-five (45) days or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting.

8.4.3    Quorum. The presence in person or by proxy of the persons entitled to vote a majority of the Units shall constitute a quorum for the transaction of business. The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment notwithstanding the withdrawal of enough Members to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a majority or such greater vote as may be required by this Agreement or by law. In the absence of a quorum, any meeting of Members may be adjourned from time to time by the vote of a majority of the Units represented either in person or by proxy, but no other business may be transacted, except as provided above.

8.4.4    Consent of Absentees. The transactions of any meeting of Members, however called and noticed and wherever held, are as valid as though they occurred at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the persons entitled to vote, not present in person or by proxy, signs a written waiver of notice, or a consent to the holding of the meeting or an approval of the minutes thereof. All waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting.

8.4.5    Action Without Meeting. Except as otherwise provided in this Agreement, any action which may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by Members having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all entitled to vote thereon were present and voted. In the event the Members are requested to consent on a matter without a meeting, each Member shall be given not less than ten (10), nor more than sixty (60), days notice. In the event the Manager or Members representing more than 30% of the Units, request a meeting for the purpose of discussing or voting on the matter, the notice of a meeting shall be given in the same manner as required by Section 8.4.1 and no action shall be taken until the meeting is held. Unless delayed as a result of the preceding sentence, any action taken without a meeting will be effective five (5) days after the required minimum number of voters have signed the consent; however, the action will be effective immediately if the Manager and Members representing at least 90% of the Units have signed the consent.

8.4.6    Record Dates. For purposes of determining the Members entitled to notice of any meeting or to vote or entitled to receive any Distributions or to exercise any rights in respect of any other lawful matter, the Manager (or Members representing more than 25% of the Units if the meeting is being called at their request) may fix in advance a record date, which is not more than sixty (60) nor less than ten (10) days prior to the date of the meeting nor more than sixty (60) days prior to any other action. If no record date is fixed:

(a)    The record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held;

(b)    The record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given;

(c)    The record date for determining Members for any other purpose shall be at the close of business on the day on which the Manager adopts it, or the 60th day before the date of the other action, whichever is later; and

(d)    A determination of Members of record entitled to notice of or to vote at a meeting of Members shall apply to any adjournment of the meeting unless the Manager, or the Members who requested the meeting fix a new record date for the adjourned meeting, but the Manager, or such Members, shall fix a new record date if the meeting is adjourned for more than forty-five (45) days from the date set for the original meeting.

8.4.7    Proxies. Every person entitled to vote or execute consents shall have the right to do so either in person or by one or more agents authorized by a written proxy executed by such person or his duly authorized agent and filed with the Manager. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. Every

51

proxy continues in full force and effect until revoked as specified or unless it states that it is irrevocable. A proxy that states that it is irrevocable is irrevocable for the period specified therein.

8.4.8    Chairman of Meeting. The Manager may select any person to preside as Chairman of any meeting of the Members, and if such person shall be absent from the meeting, or fail or be unable to preside, the Manager may name any other person in substitution therefore as Chairman. In the absence of an express selection by the Manager of a Chairman or substitute therefore, the President, Chief Operating Officer, Vice President, Secretary, or Chief Financial Officer of DMI shall preside as Chairman, in that order. The Chairman of the meeting shall designate a secretary for such meeting, who shall take and keep or cause to be taken and kept minutes of the proceedings thereof. The conduct of all Members' meetings shall at all times be within the discretion of the Chairman of the meeting and shall be conducted under such rules as he may prescribe. The Chairman shall have the fight and power to adjourn any meeting at any time, without a vote of the Units present in person or represented by proxy, if the Chairman shall determine such action to be in the best interests of the Company.

8.4.9    Inspectors of Election. In advance of any meeting of Members, the Manager may appoint any persons other than nominees for Manager or other office as the inspector of election to act at the meeting and any adjournment thereof. If an inspector of election is not so appointed, or if any such person fails to appear or refuses to act, the Chairman of any such meeting may, and on the request of any Member or his proxy shall, make such appointment at the meeting. The inspector of election shall determine the number of Units outstanding and the voting power of each, the Units represented at the meeting, the existence of a quorum, the authenticity, validity and effect of proxies, receive votes, ballots or consents, hear and determine all challenges and questions in any way arising in connection with the right to vote, count and tabulate all votes or consents, determine when the polls shall close, determine the result and do such acts as may be proper to conduct the election or vote with fairness to all Members.

8.4.10    Record Date and Closing Company Books. When a record date is fixed, only Members of record on that date are entitled to notice of and to vote at the meeting or to receive a Distribution, or allotment of rights, or to exercise the rights, as the case may be, notwithstanding any transfer of any Units on the books of the Company after the record date.

8.5    Rights of Members. No Member or Assignee shall have the right or power to: (i) withdraw or reduce his contribution to the capital of the Company, except as a result of the dissolution and termination of the Company or as otherwise provided in this Agreement or by law; or (ii) demand or receive property other than cash in return for his Capital Contribution. Except as provided in this Agreement, no Member or Assignee shall have priority over any other Member or Assignee either as to the return of Capital Contributions or as to allocations of the Net Income, Net Loss or Distributions of the Company. Other than upon the termination and dissolution of the Company as provided by this Agreement, there has been no time agreed upon when the contribution of each Member or Assignee is to be returned.

8.6    Restrictions on the Member or Assignee. No Member or Assignee shall:

8.6.1 Disclose to any non-Member other than their lawyers, accountants or consultants and/or commercially exploit any of the Company's business practices, trade secrets or any other information not generally known to the business community, including the identity of suppliers utilized by the Company;

8.6.2    Do any other act or deed with the intention of harming the business operations of the Company; or

8.6.3    Do any act contrary to the Agreement.

8.7    Return of Capital of Member. In accordance with the Act, a Member or Assignee, under certain circumstances, may be required to return to the Company, for the benefit of the Company's creditors, amounts previously distributed to the Member or Assignee. If any court of competent jurisdiction holds that any a Member or Assignee is obligated to make any such payment, such obligation shall be the obligation of such a Member or Assignee and not of the Company, the Manager or any other a Member or Assignee.

9.    **Resignation, Withdrawal, Removal or Replacement of the Manager.**
    9.1    Resignation or Withdrawal of Manager.  Subject to Section 9.3, the Manager shall not resign or withdraw as the Manager or do any act that would require its resignation or withdrawal without a Majority Vote of the Voting Members.
    9.2    Removal. The Manager may be removed by a Majority Vote of the Voting Members for any reason.
    9.3    Replacement of the Manager.  Upon the resignation, withdrawal, or removal of the Manager in accordance with Section 9, a successor Manager may be appointed by a Majority Vote of the Voting Members.

10.    **Assignment of Units.**
    10.1    Permitted Assignments. Subject to Section 8.3.1, as to the Voting Units, a Member may only sell, assign, hypothecate, encumber or otherwise transfer any part (but not less than the lesser of (i) one Unit or (ii) the Member's entire interest in the Company) or all of his or her interest in the Company if the following requirements are satisfied:
        10.1.1   The Manager consents in writing to the transfer;
        10.1.2   No Member shall transfer, assignor conveyor offer to transfer, assignor convey all or any portion of a Unit to any person who does not possess the financial qualifications required of all persons who become Members, as described in the Memorandum;
        10.1.3   No Member shall have the right to transfer any Unit to any minor or to any person who, for any reason, lacks the capacity to contract for himself or herself under applicable law. Such limitations shall not, however, restrict the right of any Member to transfer any one or more Units to a custodian or a trustee for a minor or other person who lacks such contractual capacity;
        10.1.4   The Manager, with advice of counsel, must determine that such transfer will not jeopardize the applicability of the exemptions from the registration requirements under the Securities Act of 1933, as amended, and registration or qualification under state securities laws relied upon by the Company and Manager in offering and selling the Units or otherwise violate any federal or state securities laws or NASD requirements;
        10.1.5   The Manager, with advice of counsel, must determine that, despite such transfer, Units will not be deemed traded on an established securities market or "readily tradable on a secondary market (or the substantial equivalent thereof)" under the provisions applicable to publicly traded partnership status;
        10.1.6   Any such transfer shall be by a written instrument of assignment, the terms of which are not in contravention of any of the provisions of this Agreement, and which has been duly executed by the assignor of such Units and accepted by the Manager in writing. Upon such acceptance by the Manager, such an assignee shall take subject to all terms of this Agreement and shall become an Assignee;
        10.1.7   A transfer fee shall be paid by the transferring Member in such amount as may be required by the Manager to cover all reasonable expenses, including attorneys' fees, connected with such assignment;
        10.1.8   The transfer will not result in Benefit Plan Investors owning 25% or more of the Units; and
        10.1.9   The transfer will not violate any of the terms of loan documents, including any requirement for lender approval of the transfer.
    10.2   Substituted Member.
        10.2.1   Conditions to be Satisfied. No Assignee shall have the right to become a Substituted Member unless the Manager shall consent thereto in accordance with Section 10.2.2 and all of the following conditions are satisfied:
        (a)    A duly executed and acknowledged written instrument of assignment shall have been filed with the Company, which instrument shall specify the number of Units being assigned and set forth the intention of the assignor that the assignee succeed to the assignor's interest as a Substituted Member in his or her place;
        (b)    The assignor and assignee shall have executed, acknowledged and delivered such other instruments as the Manager may deem necessary or desirable to effect such substitution, which may include an opinion of counsel regarding the effect and legality of any such proposed transfer, and which shall include: (i) the written acceptance and adoption by the assignee of the

provisions of this Agreement and (ii) the execution, acknowledgment and delivery to the Manager of a special power of attorney, the form and content of which are more fully described herein; and

(c)    A transfer fee sufficient to cover all reasonable expenses connected with such substitution shall have been paid to the Company.

10.2.2   Consent of Manager. The consent of the Manager shall be required to admit an Assignee as a Substituted Member. The granting or withholding of such consent shall be within the sole and absolute discretion of the Manager

10.2.3   Consent of Member. By executing or adopting this Agreement, each Member hereby consents to the admission of additional or Substituted Members, and to any Assignee becoming a Substituted Member upon consent of the Manager and in compliance with this Agreement.

10.3     Rights of Assignee. An Assignee shall be entitled to receive Distributions from the Company attributable to the interest acquired by reason of such assignment from and after the effective date of the assignment; provided, however, that notwithstanding anything herein to the contrary, the Company shall be entitled to treat the assignor of such interest as the absolute owner thereof in all respects, and shall incur no liability for allocations of Net Income and Net Loss or Distributions, or for the transmittal of reports or accounting until the written instrument of assignment has been received by the Company and recorded on its books. The effective date of such assignment shall be the date on which all of the requirements of this Section have been complied with, subject to Section 8 of Exhibit B.

10.4     Right to Inspect Books. Assignee shall have no right to inspect the Company's books or records, to vote on Company matters, or to exercise any other right or privilege as Members, until they are admitted to the Company as Substituted Members except as provided in the Act.

10.5     Assignment of 50% or More of Units. No assignment of any Units may be made if the Units to be assigned, when added to the total of all other Units assigned within the thirteen (13) immediately preceding months, would, in the opinion of counsel for the Company, result in the termination of the Company under the Code.

10.6     Transfer Subject to Law. No assignment, sale, transfer, exchange or other disposition of any Units may be made except in compliance with the applicable governmental laws and regulations, including state and federal securities laws and NASD requirements.

10.7     Termination of Membership Interest. Upon the transfer by a Member of a Unit in violation of this Agreement, the Membership Interest of such Member shall be automatically converted into an Economic Right.

10.8     Repurchase of Units. Beginning September 1, 2007, the Company may repurchase Sharing Units upon written request of a Member as provided in the Memorandum or below.

10.8.1   The amount repurchased on any repurchase date shall not exceed 30% of the remaining outstanding Sharing Units, unless the Manager, in its sole discretion, determines otherwise.

10.8.2   A Member seeking to have his or her Sharing Units repurchased must mail or deliver a written request to the Company (executed by the trustee or authorized agent in the case of a retirement plan) indicating his or her desire to have such Sharing Units repurchased. Such requests will be honored in the order in which they are received.

10.8.3   The repurchase request must be received by the Company not less than thirty (30) nor more than sixty (60) calendar days prior to the repurchase date. Upon the receipt of a repurchase request, the Company will send to such Member the documents necessary to effect such repurchase transaction.

10.8.4   Fully executed documents to effect the repurchase transaction must be returned to the Company at least thirty (30) before the effective date of the repurchase transaction.

10.8.5   The purchase price for repurchased Sharing Units will be equal to the Member's Net Capital Contribution for such Units, less any adjustments for losses or deductions;

10.8.6   Sharing Units repurchased pursuant to this Section 10.8 will be entitled to their pro-rata share of declared Distributions up to their redemption date.

10.8.7   Unless otherwise determined by the Manager, in its sole discretion, subject to Section 10.8.1 amounts currently available to the Company may be used to repurchase Units.

10.8.8   Upon receipt of the required documentation, the Company will, on the effective date of the repurchase transaction, repurchase the Sharing Units. Sharing   Units   repurchased   by   the Company pursuant to this Section 10.8 shall be promptly canceled.

10.8.9  If the Sharing Units of the Members desiring repurchase exceed the Section 10.8.1 ~~on~~, such Sharing Units will be deemed to have priority for subsequent Company repurchases over the ~~g~~ Units of Members who subsequently request repurchases.

10.8.10  Repurchases of Sharing Units shall be subject to the restrictions set forth in Section 10.1.

## 11.   Books, Records, Accounting and Reports.

11.1    Records, Audits and Reports. The Company shall maintain at its principal office the Company's records and accounts of all operations and expenditures of the Company including the following:

11.1.1  A current list in alphabetical order of the full name and last known business or resident address of each Member and Assignee and Manager, together with the Capital Contribution and the share in monthly profits and losses of each Member and Assignee;

11.1.2  A copy of the Articles of Organization and all amendments thereto, together with any powers of attorney pursuant to which the Articles of Organization or any amendments thereto were executed;

11.1.3  Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

11.1.4  Copies of this Agreement and any amendments thereto together with any powers of attorney pursuant to which any written accounting or any amendments thereto were executed;

11.1.5  Daily internet access with personal password protected account information;

11.1.6  Copies of any financial statements of the Company, if any, for at least the five most recent years; and

11.1.7  The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four fiscal years.

11.2    Delivery to Members and Inspection.

11.2.1  Each Member, or its representative designated in writing, has the right, upon reasonable written request for purposes related to the interest of that person as a Member, which purposes are set forth in the written request, to receive from the Company:

(a)    True and full information regarding the status of the business and financial condition of the Company;

(b)    Promptly after becoming available, a copy of the Company's federal, state and local income tax returns for each year;

(c)    A current list of the name and last known business, residence or mailing address of each Member and Manager;

(d)    A copy of this Agreement and the Articles of Organization and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which this Agreement and any certificate and all amendments thereto have been executed; and

(e)    True and full information regarding the amount of cash and description and statement of the agreed value of any property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member.

11.3    Annual Report. The Manager will cause the Company, at the Company's expense, to prepare an annual report containing a year-end balance sheet and income statement which are not audited. Copies of such statements shall be distributed to each Member within one hundred twenty (120) days after the close of each fiscal year of the Company.

11.4    Tax Information. The Manager shall cause the Company, at the Company's expense, to prepare and timely file income tax returns for the Company with the appropriate authorities, and shall cause all Company information necessary in the preparation of the Members' and Assignees' individual income tax returns to be distributed to the Member and Assignee not later than seventy-five (75) days after the end of the Company's fiscal year. The Manager shall also distribute a copy of the Company's tax return to a Member, if requested by such Member.

## 12.   Termination and Dissolution of the Company.

12.1    Termination of Company.  The Company shall be terminated and dissolved, and its affairs wound up upon the earliest to occur of the following:

12.1.1  A determination by the Manager, with a Majority Vote of the Voting Members, to terminate the Company;

12.1.2 Upon the entry of a decree of judicial dissolution;

12.1.3 The sale of the last portion of the interest in the Projects held by the Company, or

12.1.4 Notwithstanding the foregoing Sections 12.1.1, 12.1.2, and 12.1.3, the Company shall terminate on December 31, 2011, unless such time is extended by the Manager to a time not to exceed December 31, 2031. An extension of termination beyond December 31, 2031 requires a majority vote of all of the outstanding holders of Sharing Units.

12.2    Articles of Dissolution. As soon as possible following the occurrence of any of the events specified in Section 12.1, the Manager who has not wrongfully dissolved the Company or, if none, the Members, shall execute and file Articles of Dissolution in such form as shall be required by the Act.

12.3    Liquidation of Assets. Upon a dissolution and termination of the Company, the Manager (or in case there is no Manager, the Members or person designated by a Majority Vote the Voting Members) shall take full account of the Company assets and liabilities, shall liquidate the assets as promptly as is consistent with obtaining the fair market value thereof, and shall apply and distribute the proceeds therefrom in the following order:

12.3.1 First, to the payment of creditors of the Company (including the Manager, Members, Assignees and Affiliates who are creditors), but excluding secured creditors whose obligations will be assumed or otherwise transferred on liquidation of Company assets; and excluding liabilities for Distributions to Members and Assignees;

12.3.2 Second, to the setting up of any reserves as required by law for any liabilities or obligations of the Company; provided, however, that said reserves shall be deposited with a bank or trust company in escrow with interest for the purpose of disbursing such reserves for the payment of any of the aforementioned contingencies and, at the expiration of a reasonable period, for the purpose of distributing the balance remaining in accordance with the remaining provisions of this Section 12.3; and

12.3.3. Third, to the Members and Assignees as set forth in Section 5.2.

12.4    Distributions Upon Dissolution. Each Member shall look solely to the assets of the Company for all Distributions and its Capital Contributions, and shall have no recourse therefore (upon dissolution or otherwise) against any Manager or any Member.

12.5    Liquidation of Member's Interest. If there is a Liquidation of a Member's or Assignee's interest in the Company, any liquidating Distribution pursuant to such Liquidation shall be made only to the extent of the positive Capital Account balance, if any, of such Member or Assignee for the taxable year during which such Liquidation occurs after proper adjustments for allocations and Distributions for such taxable year up to the time of Liquidation. Such Distributions shall be made by the end of the taxable year of the Company during which such Liquidation occurs, or if later, within ninety (90) days after such Liquidation.

13.    **Special and Limited Power of Attorney.**

13.1    Power of Attorney. The Manager shall at all times during the term of the Company have a special and limited power of attorney as the attorney-in-fact for each Member, with power and authority to act in the name and on behalf of each such Member or Assignee to execute, acknowledge, and swear to in the execution, acknowledgment and filing of documents that are not inconsistent with the provisions of this Agreement and which may include, by way of illustration but not by limitation, the following:

13.1.1 This Agreement, as well as any amendments to the foregoing which, under the laws of the State of Wyoming or the laws of any other state, are required to be filed or which the Manager shall deem it advisable to file;

13.1.2 Any other instrument or document that may be required to be filed by the Company under the laws of any state or by any governmental agency or which the Manager shall deem it advisable to file;

13.1.3 Any instrument or document that may be required to effect the continuation of the Company, the admission of Substituted Members, or the dissolution and termination of the Company (provided such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement);

56

13.1.4  Any contract for purchase or sale of real estate, and any deed, deed of trust, mortgage, or other instrument of conveyance or encumbrance, with respect to Property;

13.1.5  This Agreement or any other instrument or document to include any special purpose entity or bankruptcy remote entity requirement imposed by a lender; and

13.1.6  Any and all other instruments as the Manager may deem necessary or desirable to effect the purposes of this Agreement and carry out fully its provisions, including, but not limited to, those in Section 15.

13.2    Provision of Power of Attorney. This special and limited power of attorney:

13.2.1  Is irrevocable, shall survive the death, incapacity, termination or dissolution of the granting Member, and is limited to those matters herein set forth;

13.2.2  May be exercised by the Manager by and through one or more of the officers of the Manager , for each of the Members by the signature of the Manager acting as attorney-in-fact for all of the Members, together with a list of all Members executing such instrument by their attorney-in-fact or by such other method as may be required or requested in connection with the recording or filing of any instrument or other document so executed; and

13.2.3  Shall survive an assignment by a Member of all or any portion of his or her Units except that, where the assignee of the Units owned by the Member has been approved by the Manager for admission to the Company as a Substituted Member, the special power of attorney shall survive such assignment for the sole purpose of enabling the Manager to execute, acknowledge and file any instrument or document necessary to effect such substitution.

13.3    Notice to Members. The Manager shall promptly furnish to a Member a copy of any amendment to this Agreement executed by DMI pursuant to a power of attorney from the Member.

## 14.    **Relationship of This Agreement to the Act.**

Many of the terms of this Agreement are intended to alter or extend provisions of the Act as they may apply to the Company or the Members. Any failure of this Agreement to mention or specify the relationship of such terms to provisions of the Act that may affect the scope or application of such terms shall not be construed to mean that any of such terms is not intended to be a limited liability company agreement provision authorized or permitted by the Act or which in whole or in part alters, extends or supplants provisions of the Act as may be allowed thereby.

## 15.    **Amendment of Agreement.**

15.1    Admission of Member. Amendments to this Agreement for the admission of any Member or Substitute Member shall not, if in accordance with the terms of this Agreement, require the consent of any Member.

15.2    Amendments with Consent of Members. In addition to any amendments otherwise authorized herein, this Agreement may be amended by the Manager with a Majority Vote the Voting Members; provided, however, that: (i) any amendment that would treat a specific Member less favorably than another Member (in application but not in effect), then such amendment shall require the vote of such adversely affected Member, and (ii) any amendment related to a matter in which the Sharing Members are entitled to vote can only be made with the Majority Vote of the Sharing Members.

15.3    Amendments Without Consent of the Members. In addition to the Amendments authorized pursuant to Section 9 of Exhibit B and Section 7.3.12 or otherwise authorized herein, the Manager may amend this Agreement, without the consent of any of the Members, to (i) change the name and/or principal place of business of the Company, or (ii) decrease the rights and powers of the Manager (so long as such decrease does not impair the ability of the Manager to manage the Company and conduct its business and affairs); provided, however, that no amendment shall be adopted pursuant to this Section 15.3 unless the adoption thereof (A) is for the benefit of or not adverse to the interests of the Members, (B) is not inconsistent with Section 7, and (C) does not affect the limited liability of the Members or the status of the Company as a partnership for federal income tax purposes. Further, the Manager shall be allowed to amend this Agreement without the consent of any of the Members to comply with any terms or modifications required by any lender.

15.4    Execution and Recording of Amendments. Any amendment to this Agreement shall be executed by the Manager, and by DMI as attorney-in-fact for the Members pursuant to the power of attorney contained in Section 13. After the execution of such amendment, the Manager shall also prepare and record or file any certificate or other document which may be required to be recorded or filed with

respect to such amendment, either under the Act or under the laws of any other jurisdiction in which the Company holds any Property or otherwise does business.

16. **Miscellaneous.**

16.1 Counterparts. This Agreement may be executed in several counterparts, and all so executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

16.2 Successors and Assigns. The terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the respective Members.

16.3 Severability. In the event any sentence or Section of this Agreement is declared by a court of competent jurisdiction to be void, such sentence or Section shall be deemed severed from the remainder of this Agreement and the balance of this Agreement shall remain in fell force and effect.

16.4 Notices. All notices under this Agreement, except those under Section 8.4.1, shall be in writing and shall be given to the Member or Assignee entitled thereto, by personal service or by mail, posted to the address maintained by the Company for such person or at such other address as he or she may specify in writing; provided, however, that in the event that any such Member does not respond to the personal service or mail as set forth above, that the Manager shall send out one additional notice by certified mail return receipt requested or by a delivery service that maintains records regarding their deliveries or attempted deliveries.

16.5 Manager's Address. The name and address of the Manager is as follows:

Diversity Management, Inc.
Attn: Winex Investments, LLC
2333 State Street, Suite 102 Carlsbad, CA 92008

16.6 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Wyoming.

16.7 Captions. Section titles or captions contained in this Agreement are inserted only as a matter of convenience and reference. Such titles and captions in no way define, limit, extend or describe the scope of this Agreement nor the intent of any provisions hereof.

16.8 Gender. Whenever required by the context hereof, the singular shall include the plural, and vice versa, the masculine gender shall include the feminine and neuter genders, and vice versa.

16.9 Time. Time is of the essence with respect to this Agreement.

16.10 Additional Documents. Each Member, upon the request of the Manager, shall perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement, including, but not limited to, providing acknowledgment before a Notary Public of any signature made by a Member.

16.11 Descriptions. All descriptions referred to in this Agreement are expressly incorporated herein by reference as if set forth in full, whether or not attached hereto.

16.12 Binding Arbitration. Any controversy arising out of or related to this Agreement or the breach thereof or an investment in the Units shall be settled by arbitration in Laramie County, Wyoming, in accordance with the roles of The American Arbitration Association, and judgment entered upon the award rendered may be enforced by appropriate judicial action. The arbitration panel shall consist of one member, which shall be the mediator if mediation has occurred or shall be a person agreed to by each party to the dispute within thirty (30) days following notice by one party that he desires that a matter be arbitrated. If there was no mediation and the parties are unable within such thirty (30) day period to agree upon an arbitrator, then the panel shall be one arbitrator selected by the nearest office of The American Arbitration Association, which arbitrator shall be experienced in the area of real estate and limited liability companies and who shall be knowledgeable with respect to the subject matter area of the dispute. The losing party shall bear any fees and expenses of the arbitrator, other tribunal fees and expenses, reasonable attorney's fees of both parties, any costs of producing witnesses and any other reasonable costs or expenses incurred by him or the prevailing party or such costs shall be allocated by the arbitrator. The arbitration panel shall render a decision within thirty (30) days following the close of presentation by the parties of their cases and any rebuttal. The parties shall agree within thirty (30) days following selection of the arbitrator to any prehearing procedures or further procedures necessary for the arbitration to proceed, including interrogatories or other discovery; provided, in any event each Member shall be entitled to discovery.

16.13 Venue. Any action relating to or arising out of this Agreement shall be brought only in a court of competent jurisdiction located in Laramie County, Wyoming.

16.14 <u>Partition</u>.    The Members agree that the assets of the Company are not and will not be suitable for partition. Accordingly, each of the Members hereby irrevocably waives any and all rights that he may have, or may obtain, to maintain any action for partition of any of the assets of the Company.

16.15 <u>Integrated and Binding Agreement</u>.  This Agreement contains the entire understanding and agreement among the Members with respect to the subject matter hereof, and there are no other agreements, understandings, representations or warranties among the Members other than those set forth herein except the Subscription Documents. This Agreement may be amended only as provided in this Agreement.

16.16   <u>Legal Counsel</u>. Each Member acknowledges and agrees that counsel representing the Company, the Manager and its Affiliates does not represent and shall not be deemed under the applicable codes of professional responsibility to have represented or to be representing any or all of the Members, other than the Manager, in any respect. In addition, each Member consents to the Manager hiring counsel for the Company that is also counsel to one or more of the Managers.

16.17   <u>Title to Company Property</u>. All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company property in its individual name or right, and each Member's Membership Interest shall be personal property for all purposes.

IN WITNESS WHEREOF, the undersigned have set their hands to this Limited Liability Agreement as of the date first set forth above.


MEMBER:

Diversity Management, Inc.


By:_____
       John Sullivan, Chief Operating Officer

**EXHIBIT B**

DEFINITIONS

"**Act**" shall mean the Wyoming Limited Liability Company Act, as the same may be amended from time to time.

"**Adjusted Capital Account Deficit**" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i)     Credit to such Capital Account any amounts that the Member is obligated to restore and the Member's share of Member Minimum Gain and Company Minimum Gain and;

(ii)    Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(!!)(5), and 1.704-1(b)(2)(ii)(d)(6).

"**Affiliate**" shall mean (i) any person directly or indirectly controlling, controlled by or under common control with another person; (ii) a person owning or controlling 10% or more of the outstanding voting securities of such other person; (iii) any officer, director or partner of such other person; and (iv) if such other person is an officer, director or partner, any company for which such person acts in any capacity. The term "person" shall include any natural person, corporation, partnership, trust, unincorporated association or other legal entity.

"**Agreement**" shall mean this Operating Agreement, as amended from time to time.

"**Articles of Organization**" shall mean the Articles of Organization of the Company as filed with the Secretary of State of Wyoming as the same may be amended or restated from time to time.

"**Assignee**" shall mean a Person to whom Units have been transferred and who has not been admitted as a Substituted Member. Until admitted as a Substituted Member, an Assignee shall have no rights in the Company except the Economic Right associated with the Units held by the assignor of the Units.

"**Benefit Plan Investors**" shall mean any employee benefit plan, a plan described in Section 4975(e)(1) of the Code and any entity whose underlying assets include plan assets.

"**Book Gain**" shall mean the excess, if any, of the fair market value of the Property over its adjusted basis for federal income tax purposes at the time a valuation of the Property is required under this Agreement or Treasury Regulations Section 1.704-1(b) for purposes of making adjustments to the Capital Accounts.

"**Book Loss**" shall mean the excess, if any, of the adjusted basis of the Property over its fair market value at the time a valuation of the Property is required under this Agreement or Treasury Regulations Section 1.704-1(b) for purposes of making adjustments to the Capital Accounts.

"**Book Value**" shall mean the adjusted basis of Property for federal income tax purposes increased or decreased by Book Gain, Book Loss, Built-In Gain and Built-In Loss as reduced by depreciation, amortization or other cost recovery deductions, or otherwise, based on such Book Value.

"**Built-In Gain (or Loss)**" shall mean the amount, if any, by which the agreed value of contributed Property exceeds (or is lesser than) the adjusted basis of Property contributed to the Company by a Member immediately after its contribution by the Member to the capital of the Company.

"**Capital Account**" with respect to any Member (or such Member's assignee) shall mean such Member's initial Capital Contribution adjusted as follows:

(i)     A Member's Capital Account shall be increased by:

(a)     such Member's share of Net Income;

(b)     any income or gain specially allocated to a Member and not included in Net Income or Net Loss;

(c)     any additional cash Capital Contribution made by such Member to the Company; and

(d)     the fair market value of any additional Capital Contribution consisting of property contributed by such Member to the capital of the Company reduced by any liabilities assumed by the Company in connection with such contribution or to which the property is subject.

(ii)    A Member's Capital Account shall be reduced by:

(a)     such Member's share of Net Loss;

(b)     any deduction specially allocated to a Member and not included in Net Income

60

(c)     any cash Distribution made to such Member; and or Net Loss;

(d)     the fair market value, as agreed to by the Manager and the Members pursuant to a Majority Vote the Voting Members, of any Property (reduced by any liabilities assumed by the Member in connection with the Distribution or to which the distributed Property is subject) distributed to such Member; provided that, upon liquidation and winding up of the Company, unsold Property will be valued for Distribution at its fair market value and the Capital Account of each Member before such Distribution shall be adjusted to reflect the allocation of gain or loss that would have been realized had the Company then sold the Property for its fair market value.

Property other than money may not be contributed to the Company except as specifically provided in this Agreement. Property of the Company may not be revalued for purposes of calculating Capital Accounts unless the Manager and the Voting Members pursuant to a Majority Vote the Voting Members agree on the fair market value of the Property and Company complies with the requirements of Treasury Regulations Section 1.704-1(b)(2)(iv)(f) and (g); provided, however, for purposes of calculating Book Gain or Book Loss (but not for purposes of adjusting Capital Accounts to reflect the contribution and distribution of such Property), the fair market value of Property shall be deemed to be no less than the outstanding balance of any nonrecourse indebtedness secured by such Property; Capital Accounts are adjusted to reflect the contribution or revaluation, including, without limitation, the valuation of such Property and the selection of book depreciation methods; and the Members, pursuant to a Majority Vote, agree on the allocation among the Voting Members of items of income, gain, depreciation, amortization and loss reflecting to such Property for federal income tax purposes.

The Capital Account of a Substituted Member shall include the Capital Account of his or her transferor. Notwithstanding anything to the contrary in this Agreement, the Capital Accounts shall be maintained in accordance with Treasury Regulations Section 1.704-1(b). References in this Agreement to the Treasury Regulations shall include corresponding subsequent provisions.

**"Capital Contribution"** shall mean the gross amount invested in the Company by a Member and shall be equal in amount to the cash purchase price paid by such Member for the Units credited to him or her by the Company and any future amounts contributed. In the plural, **"Capital Contributions"** shall mean the aggregate amount invested by all of the Members in the Company and shall equal, in total, the sum of the amount attributable to the purchase of Units and the contributions of the Manager.

**"Cash Flow"** shall mean cash funds from the operations of the Company, including, without limitation, interest, other investment income, any net income received from the operation of a Project, net income received from the operation of a Project, and net cash proceeds received by the Company from the sale of a Project, but excluding Capital Contributions.

**"Code"** shall mean the Internal Revenue Code of 1986, as amended or corresponding provisions of subsequently enacted federal revenue laws.

**"Company"** shall refer to Winex Investments, LLC.

**"Company Minimum Gain"** shall mean "partnership minimum gain" as set forth in Treasury Regulations Sections 1.704-2(d).

**"DMI"** shall mean Diversity Management, Inc., a Wyoming corporation.

**"Depository Account"** shall have the meaning set forth in Section 3.1.6.

**"Distribution"** shall refer to any money or other property transferred without consideration (other than repurchased Units) to Members or Owners with respect to their interests or Units in the Company, but shall not include any payments to the Manager pursuant to Section 6 or other Sections of the Agreement.

**"Economic Right"** shall mean a right to share in the Net Income, Net Loss and Distributions of the Company.

**"Liquidation"** means in respect to the Company the earlier of the date upon which the Company is terminated under Section 708(b)(1) of the Code or the date upon which the Company ceases to be a going concern (even though it may exist for purposes of winding up its affairs, paying its debts and distributing any remaining balance to its Members), and in respect to a Member where the Company is not in Liquidation means the date upon which occurs the termination of the Member's entire interest in the Company by means of a distribution or the making of the last of a series of Distributions (whether or not made in more than one year) to the Member by the Company.

**"Majority Vote"** shall mean the affirmative vote of Members holding more than 50% of the Units entitled to vote on the matter. For example, if the vote is limited to the Sharing Members, then the Majority Vote would mean the Sharing Members holding more than 50% of the outstanding Sharing Units.

Members shall be entitled to cast one vote for each Unit they own, and a fractional vote for each fractional Unit they own.

"**Manager**" shall refer to the entity or person designated in accordance with Article 7 to manage the business and affairs of the Company. The initial Manager is DMI. The term "Manager" shall also refer to any successor or additional Manager, who is properly designated as a Manager.

"**Member**" shall mean any holder of a Unit who is admitted to the Company as a Member or a Substituted Member.

"**Member Minimum Gain**" shall mean "partner nonrecourse debt minimum gain" as determined under Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Debt**" shall mean "partner nonrecourse debt" as set forth in Treasury Regulations Section 1.704-2(b)(4).

"**Member Nonrecourse Deductions**" shall mean of "partner nonrecourse deductions," and the amount thereof shall be, as set forth in Treasury Regulations Section 1.704-2(i).

"**Membership Interest**" shall mean all the rights and obligations of a Member in the Company, in accordance with the Units held by such Member, which includes the Economic Right, the voting right, the right to receive information pertaining to the Company's affairs, and other rights described in this Operating Agreement together with the obligation to comply with all the terms and provisions of this Operating Agreement.

"**Memorandum**" shall mean the Private Placement Memorandum dated March 7, 2007, pertaining to the Offering distributed to potential purchasers of Units.

"**Net Capital Contribution**" shall mean the Capital Contribution for any particular Member, reduced from time to time by any distribution of Net Cash Flow pursuant to Section 5.1 as the case may be. The Net Capital Contribution shall be zero when all of the Unit holder's Capital Contribution has been returned.

"**Net Cash Flow**" shall mean Cash Flow, less any and all operating expenses of the Company.

"**Net Income**" or "**Net Loss**" shall mean, respectively, for each taxable year of the Company the taxable income and taxable loss (exclusive of Built-In Gain or Loss) of the Company as determined for federal income tax purposes in accordance with Section 703(a) of the Code (including all items of income, gain, loss, or deduction required to be separately stated pursuant to Section 7030)(1) of the Code) (other than any specific item of income, gain (exclusive of Built-In Gain), loss (exclusive of Built-In Loss), deduction or credit subject to special allocation under this Agreement), with the following modifications:

(a)    The amount determined above shall be increased by any income exempt from federal income tax;

(b)    The amount determined above shall be Section 705(a)(2)(B) of the Code or expenditures treated as such pursuant to Treasury Regulations Section 1.704-1 (b)(2)(iv)(i); and

(c)    For purposes of this Agreement, Book Gain and Book Loss attributable to a revaluation of Property attributable to unrealized gain or loss-in such Property shall be treated as Net Income and Net Loss.

"**Nonrecourse Debt**" shall have the meaning set forth in Treasury Regulations Section 1.704 2(b)(3).

"**Nonrecourse Deductions**" shall have the meaning, and the amount thereof shall be, as set forth in Treasury Regulations Section 1.704-2(c).

"**Non-Voting Units**" shall mean Sharing Units.

"**Offering**" shall mean the offering and sale of the Units made in accordance with the provisions of Section 3.1.

"**Offering Termination Date**" shall mean when 50,000 Sharing Units are sold or September 30, 2007, unless extended to December 31, 2007, at the sole discretion of the Manger.

"**Organization and Offering Expenses**" shall mean those expenses incurred in connection with the organizing the Company, preparing the Memorandum and subsequently offering and distributing the Units to investors, including without limitation, legal and accounting fees, sales commissions paid in connection with the distribution of the Units, due diligence expenses and all advertising expenses. Sales commissions includes all selling commissions or dealer-manager fees paid by the Company to any broker-dealers, including without limitation, Affiliates of the Manager, with respect to the sale of Units.

"**Project(s)**" shall have the meaning set forth in Section 1.3 of this Agreement and includes all development projects owned by the Company, either directly or indirectly through other entities in which

the Company invests including development projects owned by the Manager, Affiliates of the Company or through joint venture arrangements, and any personal property related thereto.

**"Property"** shall refer to any or all of such real and tangible or intangible personal property or properties as may be acquired by the Company, including a Project.

**"Regulatory Allocations"** shall mean the allocations set forth in Sections 4.1.1(a) through (d).

**"Reserves"** shall mean the amount of Cash Flow set aside at the discretion of the Manager to be used immediately or sometime thereafter to: (i) defray liabilities and obligations of the Company reasonably expected, or (ii) to invest in additional Projects, directly or indirectly through other entities, the Manager, Affiliates of the Company or through joint venture arrangements.

**"Sharing Members"** shall mean those Members who hold Sharing Units.

**"Sharing Units"** shall mean a class of Units held by a Member or Assignee, including any and all benefits to which the holder of such Sharing Units may be entitled as provided in this Agreement.

**"Subscription Agreement"** means the agreement, in the form attached to the Memorandum, by which each person desiring to become a Member shall evidence (i) the number of Sharing Units which such person wishes to acquire and (ii) such person's agreement to become a party to, and be bound by the provisions of, this Agreement and (iii) certain representations regarding the person's finances, investment intent and other matters.

**"Subscription Payment"** shall mean the cash payment that must accompany each subscription for Units sold through the Offering.

**"Substituted Member"** shall mean any person admitted as a substituted Member pursuant to this Agreement.

**"Tax Payment"** shall have the meaning set forth in Section 4.3.

**"Unit"** shall mean an ownership interest in the Company used to calculate the allocation of Net Income and Net Loss, the Distributions, the voting percentage of Members (if any), and other purposes specified in the Agreement. There are two classes of Units: Sharing Units and Voting Units.

**"Voting Members"** shall mean those Members who hold Voting Units.

**"Voting Units"** shall mean a class of Units held by a Member or Assignee, including any and all benefits to which the holder of such Voting Units may be entitled as provided in this Agreement.

**EXHIBIT C**

TAX ALLOCATIONS

1.        Defined Terms. All references to an Article or a Section in this Exhibit shall refer to the Articles and Sections of the Agreement to which this Exhibit is attached.

        (a)        Qualified Income Offset. Except as provided in this Exhibit or in the Agreement, in the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit created by such adjustment, allocation or distribution as quickly as possible.

        (b)        Gross Income Allocation. Net Loss shall not be allocated to any Member to the extent such allocation would cause any Member to have an Adjusted Capital Account Deficit at the end of a fiscal year. In the event any Member has an Adjusted Capital Account Deficit at the end of any fiscal year, each such Member shall be specially allocated items of Company gross income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible.

        (c)        Company Minimum Gain Chargeback. Notwithstanding any other provision of Section 4, if there is a net decrease in Company Minimum Gain during any Company fiscal year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(2). This Section is intended to comply with the partnership minimum gain chargeback requirement in the Treasury Regulations and shall be interpreted consistently therewith. These provisions shall not apply to the extent the Member's share of net decrease in Company Minimum Gain is caused by a guaranty, refinancing, or other change in the debt instrument causing it to become partially or wholly recourse debt or Member Nonrecourse Debt, and such Member bears the economic risk of loss (within the meaning of Treasury Regulations Section 1.752-2) for the newly guaranteed, refinanced or otherwise changed debt or to the extent the Member contributes cash to the capital of the Company that is used to repay the Nonrecourse Debt, and the Member's share of the net decrease in Company Minimum Gain results from the repayment.

        (d)        Member Minimum Gain Chargeback. Notwithstanding any other provision of Section 4, if there is a net decrease in Member Minimum Gain, any Member with a share of that Member Minimum Gain (as determined under Treasury Regulations Section 704-2(i)(5)) as of the beginning of the year shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(2). This Section shall not apply to the extent the net decrease in Member Minimum Gain arises because the liability ceases to be Member Nonrecourse Debt due to conversion, refinancing or other change in a debt instrument that causes it to become partially or wholly a Nonrecourse Debt. This Section is intended to comply with the partner minimum gain chargeback requirements in the Treasury Regulations and shall be interpreted consistently therewith and applied with the restrictions attributable thereto.

        (e)        Nonrecourse Deductions. Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Members in proportion to their Units and each Member's share of excess Nonrecourse Debt shall be in the same proportion.

        (f)        Member Nonrecourse Deductions. Member Nonrecourse Deductions for any fiscal year shall be allocated to the Member who bears the economic risk of loss as set forth in Treasury Regulations Section 1.752-2 with respect to the Member Nonrecourse Debt. If more than one Member bears the economic risk of loss for a Member Nonrecourse Debt, any Member Nonrecourse Deductions attributable to that Member Nonrecourse Debt shall be allocated among the Members according to the ratio in which they bear the economic risk of loss.

        (g)        Code Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis),

64

and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Treasury Regulations.

2.    Curative Allocations. Notwithstanding any other provision of this Agreement, the Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

3.    Contributed Property. Notwithstanding any other provision of this Agreement, the Members shall cause depreciation and/or cost recovery deductions and gain or loss attributable to Property contributed by a Member or revalued by the Company to be allocated among the Members for income tax purposes in accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder.

4.    Commission Discounts. In the event any Member receives a discount as described in Section 3.1.3, such Member shall be treated upon liquidation of the Company as if such Member had not received a discount and an appropriate income allocation shall be made to such Member so that all liquidating Distributions to the Members per Unit are equal.

5    Recapture Income. The portion of each Member's distributive share of Net Income that is characterized as ordinary income pursuant to Section 1245 or 1250 of the Code shall be proportionate to the amount of Net Income or Net Loss which included the corresponding depreciation deductions that were allocated to such Member as compared with the amount of depreciation deductions allocated to all Members.

6.    Allocation Among Units. Except as otherwise provided in this Agreement, all Distributions and allocations made to the Units shall be in the ratio of the number of Units held by each such Member on the date of such allocation (which allocation date shall be deemed to be the last day of each month) to the total outstanding Units as of such date, and, except as otherwise provided in this Agreement without regard to the number of days during such month that the Units were held by each Member. Members who purchase Units at different times during the Company tax year shall be allocated Net Income and Net Loss using the monthly convention set forth in Section 4. For purposes of Section 4, an Assignee shall be treated as a Member.

7.    Allocation of Company Items. Except as otherwise provided herein, whenever a proportionate part of Net income or Net Loss is allocated to a Member, every item of income, gain, loss or deduction entering into the computation of such Net Income or Net Loss, and every item of credit or tax preference related to such allocation and applicable to the period during which such Net Income or Net Loss was realized shall be allocated to the Owner in the same proportion.

8.    Assignment. In the event of the assignment of a Unit, the Net Income and Net Loss shall be apportioned as between the Member and his or her assignee based upon the number of months of their respective ownership during the year in which the assignment occurs, without regard to the results of the Company's operations during the period before or after such assignment. Distributions shall be made to the holder of record of the Units as of the date of the Distribution. An assignee that receives Units during the first fifteen (15) days of a month will receive any allocations relative to such month. An assignee that acquires Units on or after the sixteenth day of a month will be treated as acquiring his or her Units on the first day of the following month.

9.    Power of Manager to Vary Allocations. It is the intent of the Members that each Member's share of Net Income and Net Loss be determined and allocated in accordance with Section 704(b) and Section 514(c)(9) of the Code and the provisions of this Agreement shall be so interpreted. Therefore, if the Company is advised by the Company's legal counsel that the allocations provided in Section 4 are unlikely to be respected for federal income tax purposes, the Manager is hereby granted the power to amend the allocation provisions of this Agreement to the minimum extent necessary to comply with Section 704(b) and Section 514(c)(9) of the Code and effect the plan of allocations and distributions provided for in this Agreement.

10.    No Deficit Restoration Obligation. Notwithstanding anything in this Agreement to the contrary, the Agreement shall not be construed as creating a deficit restoration obligation or otherwise personally obligate any Member or Assignee to make a contribution in excess of the respective Capital Contribution of such Member or Assignee.

**EXHIBIT D**

**SUBSCRIPTION AGREEMENT**

# SUBSCRIPTION AGREEMENT

## Winex Investments, LLC

LLC Interests

Minimum Investment - $50,000

## 2333 State Street, Suite 102

## Carlsbad, CA 92008

THIS SUBSCRIPTION AGREEMENT (the "Agreement") is made by and between Winex Investments, LLC, a Wyoming Limited Liability Company (the "Company"), and the undersigned prospective purchaser (sometimes hereinafter referred to as the "Subscriber" or the "Investor") who is subscribing hereby for certain investment interests in Winex Investments, LLC (the "Interests"), pursuant to the Company's Confidential Private Placement Memorandum, dated March 7, 2007 (the "Memorandum" which term includes all exhibits and supplements thereto and any amendments thereof) distributed to a limited number of accredited investors in connection with the offering of the Interests.

In consideration of the Company's agreement to sell Interests to the Subscriber upon the terms and conditions summarized in the Memorandum, the Subscriber hereby agrees and represents to the Company as follows:

## A. SUBSCRIPTION

1.      The Interests will be offered and sold to you in a non-public placement to a limited number of purchasers in the United States who are "Accredited Investors" as that term is defined under Rule 501 of Regulation D ("Regulation D") promulgated under the Securities Act of 1933, as amended (the "1933 Act"). The Interests are offered pursuant to the Memorandum.

Upon original issuance thereof, and until such time as the same is no longer required under the applicable requirements of the 1933 Act, the Interests shall bear the following legend:

THE SECURITY EVIDENCED HEREBY WAS ISSUED PURSUANT TO REGULATION D IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, (THE "1933 ACT"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF REGISTRATION UNDER THE 1933 ACT OR AN APPLICABLE EXEMPTION THEREFROM. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE COMPANY THAT THE SECURITIES MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 OR RULE 14-1A UNDER THE SECURITIES ACT, OR PURSUANT TO ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND IN EACH CASE, IN ACCORDANCE WITH THE APPLICABLE

SECURITIES LAWS OF ANY STATE, AND THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH ABOVE.

2.    On the basis of the representation and warranties contained in this Agreement, and subject to its terms and conditions and further subject to acceptance of this Agreement by the Company, the Company agrees to issue and sell to the Investor, and the Investor agrees to purchase from the Company, the number of Interests set forth on the "Section I Execution" page hereof by payment to the Company of the amount set forth on the "Section I Execution" page hereof (the "Subscription Amount") either (i) in the form of a certified or bank check, payable in United States dollars to "Wells Fargo Bank FBO Winex Investments, LLC" or (ii) by wire transfer (wire instructions available upon request).

3.    The Subscriber understands that the Company will accept or reject all subscriptions no more than 30 calendar days following receipt of the completed Subscription Agreement and a transfer to the Company of funds in the full Subscription Amount. In the event that a subscription is rejected, the Subscription Amount (or, in the case of rejection of a portion of the undersigned's subscription, the part of the Subscription Amount relating to such rejected portion) shall be returned to the Subscriber by the Company, without interest being paid thereon.

4.    The Subscriber hereby acknowledges receipt of a copy of the Memorandum, including all exhibits thereto, and hereby adopts, accepts and agrees to be bound by each provision thereof upon the (i) execution and delivery to the company of the completed Subscription Agreement submitted by the Subscriber, and (ii) acceptance by the Company of the Subscriber's subscription for Interests.

## B. REPRESENTATIONS AND WARRANTIES

The Subscriber hereby represents and warrants to, and agrees with, the Company as follows:

1.    In the case of a Subscriber who is an individual, the Subscriber has reached the age of majority in the state or county in which he or she resides, has adequate means of providing for his or her current needs and personal contingencies.

2.    The Subscriber, if acting in a representative capacity or as an agent, has full authority to make the representations and warranties specified herein and to consummate the transactions contemplated herein in such capacity.

3.    The Subscriber is acquiring the Interests for the Subscriber's own account, for investment purposes only, not for the account of any other person, and not with a view to distribution, assignment or resale to others or to fractionalization in whole or in part (excluding transfers which constitute bona fide gifts, provided the transferee agrees to be bound by terms of this Agreement). No other person has or will have a direct or indirect beneficial interest in the Interests. The Subscriber will not sell, hypothecate or otherwise transfer the Interests unless (i) the Interests to be transferred are registered under the 1933 Act and applicable state securities laws or (ii) in the opinion of counsel, concurred in by counsel to the Company, an exemption from the registration requirements of the 1933 Act and from the requirements of such state laws is available.

4.    The Subscriber has been furnished with and has carefully read the Memorandum. and is familiar with and understands the terms of the offering and the terms of the Interests. The Subscriber and his, her or its representatives have also either been supplied with or been given access by the Company to all information which the Subscriber has requested relating to an investment in the Interests, and all documents and information a reasonable investor would consider material in making an investment decision concerning the Interests, and has had the opportunity to ask questions and receive answers from knowledgeable individuals concerning the Company and the Interests, so that the Subscriber has all information Subscriber deems to be relevant or material to make a decision to purchase the Interests. In evaluating the suitability of an investment in the Company, the Subscriber has not relied upon any representations or other information (whether oral or written) from any other person, including without limitation, the Company, other than as set forth in the Memorandum, and is not relying on any other person to undertake to furnish or verify the information relating to this transaction. With respect to individual tax and other economic considerations involved in this investment, the Subscriber is not relying on the Company. The Subscriber has carefully considered and has, to the extent the Subscriber believes necessary, discussed with the Subscriber's professional, legal, tax, accounting and financial advisors the suitability of an investment in the Interests for the Subscriber's particular tax and financial situation and has determined that the Interests being subscribed for by the Subscriber are a suitable investment for the Subscriber.

5.    The Subscriber has a pre-existing personal or business relationship with the Company or its officers or directors, or, by reason of the Subscriber's business or financial experience (or the business or financial experience of the Subscriber's professional advisors who are not affiliated with and who are not compensated by the Company or any affiliate of the Company) has the capacity to protect his, her or its own interests in connection with this investment in the Interests, and either alone or with the Subscriber's professional advisors (as described above ) has such knowledge and experience in financial and business matters that the Subscriber is capable of evaluating the merits and risks of an investment in the Interests.

6.    THE SUBSCRIBER HEREBY REPRESENTS AND WARRANTS TO THE COMPANY THAT HE, SHE, OR IT SATISFIES ONE OF THE FOLLOWING REQUIREMENTS: *(Initial the applicable statement)*

**Initials**

_____    i    the Subscriber is an individual whose net worth, individually or jointly with spouse, currently exceeds $1,000,000; or

_____    ii    the Subscriber is an individual whose individual income (exclusive of that of spouse) exceeded $200,000 in each of the immediately preceding 2 years, and who reasonably expects his or her personal income to exceed $200,000 in the current year; or

_____    iii    the Subscriber is an individual whose joint income with that of his or her spouse exceeded $300,000 in each of the immediately preceding 2 years, and who reasonably expects such joint income to exceed $300,000 in the current year; or

69

_____ iv  the Subscriber is a director, executive officer, or general partner of the Company or a director, executive officer or general partner of a general partner of the Company; or

_____ v  the Subscriber is (a) a bank as defined in Section 3(a)(2) of the 1933 Act or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the 1933 Act, whether acting in its individual or fiduciary capacity, (b) a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, (c) an insurance company as defined in Section 2(13) of the 1933 Act, (d) an investment company registered under the Investment Company Act of 1940, or a business development company as defined in Section 2(a)(48) of that act, (e) a Small Business Investment Company licensed by the United States Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, (f) a plan established and maintained by a state or its political subdivision, or any agency or instrumentality of a state or its political subdivision, for the benefit of its employees, if such plan has total assets in excess of $5 million, or (g) an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which plan fiduciary is a bank, savings and loan association, insurance company or a registered investment advisor, or if the employee benefit plan has total assets in excess of $5 million or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors; or

_____ vi  the Subscriber is a private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940; or

_____ vii  the Subscriber is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, a corporation, a Massachusetts or similar business trust or a partnership, not formed for the specific purpose of acquiring the Interests with total assets in excess of $5 million; or

_____ viii  the Subscriber is a trust not formed for the specific purpose of acquiring the Interests, whose total assets exceed $5 million and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of this investment; or

_____ ix  the Subscriber is an entity all of the equity owners of which meet the requirements of category (i), (ii), (iii), (iv), (v), (vi), (vii) or (viii) above.

7.  Indicate whether the assets being invested in the Interests constitute "plan assets" within the meaning of ERISA and regulation 2510.3-101 promulgated thereunder (Initial whichever one applies):

70



_____ Yes, the assets being invested in the Interests <u>do</u> constitute "plan assets" within the meaning of ERISA and regulation 2510.3-101 promulgated thereunder.

_____ No, the assets being invested in the Interests <u>do not</u> constitute "plan assets" within the meaning of ERISA and regulation 2510.3-101 promulgated thereunder.

8.    The Subscriber recognizes that investment in the Company involves substantial risks, including the risk of loss of the entire amount of such investment, and has taken full cognizance of and understands all the risk factors and tax consequences related to the Subscriber's purchase of the Interests. The Subscriber is willing to assume, and has substantial financial resources necessary to withstand, all the risks involved in the investment and the potential loss of investment in the Interests.

9.    If this Subscription Agreement is executed and delivered on behalf of a partnership, corporation or trust: (i) such partnership, corporation or trust has been duly authorized and is duly qualified (a) to execute and deliver this Subscription Agreement and all other instruments executed and delivered on behalf of such partnership, corporation or trust or by use of a power of attorney in connection with the purchase of its Interests, (b) to delegate authority pursuant to a power of attorney and (c) to purchase and hold such Interests; (ii) the signature of the party signing on behalf of such partnership, corporation or trust is binding upon such partnership, corporation or trust, and (iii) such partnership, corporation or trust has not been formed for the specific purpose of acquiring such Interests, unless each equity and beneficial owner of such entity is an Accredited Investor under Regulation D and has submitted information substantiating such qualification.

10.    The Subscriber hereby agrees to indemnify and hold harmless the Company, and each officer, director or control person of the Company and each officer and director of any such control person (each, an "<u>Indemnified Party</u>") who was or is a party or is threatened to be made a party to any threatened, pending or completed suit, action or proceeding, whether civil or criminal, administrative or investigative, to the fullest extent permitted by law, against any Losses incurred by reason of or arising from any actual or alleged misrepresentation or misstatement of facts or omission to represent or state facts made by the Subscriber to the Company including, without limitation, any such misrepresentation, misstatement or omission contained in this Subscription Agreement. For purposes of this paragraph, "<u>Losses</u>" shall include any and all losses, damages, liabilities and expenses for which an Indemnified Party has not otherwise been reimbursed (including attorneys' fees, judgments, fines and amounts paid in settlement or incurred in a securities or other action in which no judgment in favor of the Subscriber is rendered) actually and reasonably incurred by such person or entity in connection with such action, suit or legal proceeding.

## C. UNDERSTANDINGS

The Subscriber understands, acknowledges and agrees with the Company as follows:

71

1.      This Subscription may be rejected, in whole or in part, by the Company, or its Officers in their sole and absolute discretion. The Company may also allot to any prospective Subscriber fewer than the number of Interests subscribed for by such prospective Subscriber.

2.      This Subscription is and shall be irrevocable by the Subscriber except to the extent otherwise provided by any applicable state law.

3.      I have such knowledge and experience in financial and business matters that I am capable of evaluating the merits and risks of a purchase of the Interests. The following is a description of my experience in financial and business matters: _____

_____

_____

4.      Title to Interests to be taken in accordance with the attached vesting instructions.

5.      I acknowledge that the sale of the Interests has not been accompanied by the publication of any advertisement, any general solicitation or as the direct result of an investment seminar sponsored by the Company or any of its affiliates.

6.      THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATES AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SAID ACT AND SUCH LAWS. THE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER SAID ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

7.      THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD OR OTHERVWSE DISPOSED OF EXCEPT AS PERMITTED UNDER THE 1933 ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT UNTIL THE INTERESTS ARE REDEEMED.

**D.**  **VESTING REGISTRATION INFORMATION**

Please print the exact name purchaser desires on the account:

_____

_____

Mailing address:  _____

_____

The above Vesting Registration is:
(Please check the appropriate box below)
( ) A SINGLE MAN ( ) A SINGLE WOMAN (Single means never married)
( ) AN UNMARRIED MAN ( ) AN UNMARRIED WOMAN (Unmarried means divorced)
( ) A WIDOWER ( ) A WIDOW
( ) AS JOINT TENANTS (Joint Tenants have right of survivorship)
( ) HUSBAND AND WIFE AS JOINT TENANTS
( ) HUSBAND AND WIFE AS COMMUNITY PROPERTY (See special instructions below)
( ) AS TENANTS IN COMMON (Tenants in Common must set forth each person's undivided
interest percentage)
( ) A MARRIED (Man) (Woman) as (His) (Her) SOLE AND SEPARATE PROPERTY (This will
require a spousal acknowledgement and agreement)
( ) TRUST (See special instructions below)
( ) CORPORATION (See special instructions below)
( ) PARTNERSHIP (See special instructions below)
( ) LIMITED LIABILITY COMPANY (See special instructions below)

**E.**  **DISTRIBUTIONS**

Please indicate to whom distributions should be sent, if not to the address set forth above.

Name:  _____

Mailing address:  _____

_____

Account Number:  _____

**F.**  **PURCHASER INFORMATION**

Please send all purchaser correspondence to the following:

Name:  _____

Mailing address:  _____

_____

Telephone  Work: (_____)_____  Home: (_____)_____

           Fax:  (_____)_____  Cell:  (_____)_____

Primary State of Residence: _____

Federal Tax ID Number: _____

E-mail address: _____

## G. MISCELLANEOUS

1.     This Subscription Agreement is not binding on the Company until the Company has executed it.

2.     This Subscription Agreement and the representations and warranties contained herein shall be binding upon the heirs, executors, administrators, and other successors of the Subscriber and this Subscription Agreement shall inure to the benefit of and be enforceable by the Company. If there is more than one signatory hereto, the obligations, representations, warranties and agreements of the Subscriber are made jointly and severally.

3.     Neither this Subscription Agreement nor any provisions hereof shall be waived, modified, changed, discharged, terminated, revoked or canceled except by an instrument in writing signed by the party against whom any such change, discharge or termination is sought.

4.     Failure of the Company to exercise any right or remedy under this Subscription Agreement or any ocher agreement between the Company and the Subscriber, or delay by the Company in exercising such right or remedy, will not operate as a waiver thereof. No waiver by the Company will be effective unless and until it is in writing and signed by the Company.

5.     This Subscription Agreement shall be enforced, governed and construed in all respects in accordance with the laws of the State of California, as such laws are applied by California courts to agreements entered into and to be performed in California by and between residents of California. In the event that any provision of this Subscription Agreement is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

6.     This Subscription Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by writing executed by all parties hereto.

**H.    EXECUTION OF AGREEMENT BY POWER OF ATTORNEY**

IF THE SUBSCRIBER HAS SIGNED THIS SUBSCRIPTION AGREEMENT BY POWER OF ATTORNEY, THE SUBSCRIBER REPRESENTS THAT ATTACHED HERETO IS A TRUE AND COMPLETE COPY OF SUCH POWER OF ATTORNEY.

**I.    EXECUTION**

The undersigned Subscriber, desiring to purchase Interests of Winex Investments, LLC (the "Interests") pursuant to the Confidential Private Placement Memorandum dated March 7, 2007 (the "'Memorandum") of Winex Investments, LLC, a Wyoming Limited Liability Company (the "Company"), by executing the appropriate Signature Page below, hereby agrees to be bound by all terms of this Subscription Agreement, and further, hereby executes, adopts, makes, confirms and agrees to all terms, conditions, representations and warranties of this Subscription Agreement.

Dated as of this _____ day of _____, 2007

Subscription Amount: Units _____    $_____
(minimum 50 Units at $1,000 per Unit)

**[BALANCE OF PAGE INTENTIONALLY BLANK]**

Please execute this Subscription Agreement by completing the appropriate section below.

1.    INDIVIDUAL        If the Subscriber is an INDIVIDUAL, complete the following:

_____                    _____
Signature of Investor                          Signature of Joint Owner (if applicable)

_____                    _____
Name                                           Name of Joint Owner (if applicable)

_____                    _____
Social Security Number                         Social Security Number of Joint Owner

_____                    _____
State of Legal Residence                       State of Legal Residence


2.    CORPORATION        If the Subscriber is a CORPORATION, complete the following:

The undersigned hereby represents, warrants and agrees that (i) the undersigned has been duly authorized by all requisite action on the part of the corporation listed below (the "Corporation") to acquire the Interests, (ii) the Corporation has all requisite power and authority to acquire the Interests, and (iii) the undersigned officer of the Corporation has authority under the Articles of Incorporation, Bylaws, and resolutions of the Board of Directors of the Corporation to execute this Purchaser Questionnaire and the Subscription Agreement. **The undersigned officer encloses a true copy of the Articles of Incorporation, the Bylaws and, as necessary, the resolutions of the Board of Directors authorizing a purchase of the Interests, in each case as amended to date.**

Name of Corporation (Please type or print): _____

_____

By: _____

Name: _____

Title: _____

Federal Employer ID Number: _____

State of Formation: _____

76

3.    PARTNERSHIP    If the Subscriber is a PARTNERSHIP, complete the following:

The undersigned hereby represents, warrants and agrees that (i) the undersigned is a general partner of the partnership named below (the "Partnership"), (ii) the undersigned general partner has been duly authorized by the Partnership to acquire the Interests and the general partner has all requisite power and authority to acquire the Interests, and (iii) the undersigned general partner is authorized by the Partnership to execute this Purchaser Questionnaire and the Subscription Agreement. **The undersigned general partner encloses a true copy of the Partnership Agreement of the Partnership, as amended to date, together with a current and complete list of all partners and, as necessary, the resolutions of the Partnership authorizing the purchase of the Interests.**

Name of Partnership (Please type or print): _____

_____

By: _____

Name: _____

Title: General Partner

Federal Employer ID Number: _____

State of Formation: _____

4.    TRUST    If the Subscriber is a TRUST, complete the following:

The undersigned hereby represents, warrants and agrees that (i) the undersigned trustee is duly authorized by the terms of the trust instrument (the "Trust Instrument") for the Trust ("Trust") set forth below to acquire the Interests, (ii) the undersigned, as trustee, has all requisite power and authority to acquire the Interests for the Trust, and (iii) the undersigned trustee is authorized by the Trust to execute this Purchaser Questionnaire and the Subscription Agreement. **The undersigned trustee encloses a true copy of the Trust Instrument of said Trust, as amended to date, and, as necessary, the resolutions of the trustees authorizing the purchase of the Interests.**

Name of Trust (Please type or print): _____

_____

By: _____          By: _____

Name: _____          Name: _____

Title: Trustee                                            Title: Trustee

Federal Employer ID Number: _____

State of Formation: _____          Date of Formation: _____

5.    LIMITED LIABILITY COMPANY ("LLC") If the subscriber is an LLC, complete the following:

The undersigned hereby represents, warrants and agrees that (i) the undersigned is either the authorized manager or all of the members of the limited liability company named below (the "LLC"), (ii) the undersigned has been duly authorized by the LLC to acquire the Interests and has all requisite power and authority to acquire the Interests, and (iii) the undersigned is authorized by the LLC to execute this Purchaser Questionnaire and the Subscription Agreement. **The undersigned encloses a true copy of the Operating Agreement of the LLC, as amended to date, together with a current and complete list of all members and managers and, as necessary, the resolutions of the LLC authorizing the purchase of the Interests.**

Name of LLC (Please type or print): _____

_____

By: _____

Name: _____

Title: Manager

By: _____

Name: _____

Title: Manager

Federal Employer ID Number: _____    State of Formation: _____

*******OR******

By: _____

Name: _____

Title: Member

By: _____

Name: _____

Title: Member

By: _____

Name: _____

6.    HUSBAND AND WIFE AS COMMUNITY PROPERTY    If  the  subscribers  are HUSBAND AND WIFE AS COMMUNITY PROPERTY and wish to have their Interests qualify as a disregarded entity in accordance with Revenue Procedure 2002-69, complete the following:

Each of the undersigned hereby represents, warrants and agrees that (i) the LLC Interests will be wholly owned by them as husband and wife as community property under the laws of a state, foreign country or possession of the United States, (ii) no person other than one or both spouses would be considered an owner for federal tax purposes, (iii) the LLC Interests are not treated as a corporation pursuant to Treasury Regulations Section 301.7702-2(b) defining corporations, and (iv) they have consulted their own tax advisor as to the applicability of the Revenue Procedure 2002-69 to their situation.

Each spouse acknowledges that neither the Company nor the Manager will make any vesting recommendations but will rely on the vesting instructions herein.

_____          _____
Name of Spouse (Please type or print)          Name of Spouse (Please type or print)


_____          _____
Federal ID Number          Federal ID Number


_____          _____
State of Residence          State of Residence


7.    RETIREMENT ACCOUNT If the Subscriber is a custodial account, complete the following:

The undersigned hereby represents, warrants and agrees that (i) the undersigned custodian is duly authorized by the terms of the custodial agreement with the custodial account owner set forth below to acquire the Interests, (ii) the undersigned, as custodian, has all requisite power and authority to act on the directives of the custodial account owner to acquire the Interests for the custodial account, and (iii) the undersigned custodian is authorized by the account owner to execute this Purchaser Questionnaire and the Subscription Agreement.

Name of custodial account (Please type or print): _____

_____

Custodial Address: _____

_____

_____/_____/_____
Custodial Tax ID Number      Custodial Account Number      Custodial Telephone Number

By: _____          By: _____

Name: _____          Name: _____

Title: Custodian          Title: Custodial account owner

79

**EXHIBIT E**

**WINEX INVESTMENTS, LLC**

**BALANCE SHEET**

**MARCH 7, 2007**

**ASSETS**

Cash                                                                                    **$100**

**LIABILITIES & MEMBERS CAPITAL**

Member's Capital                                                                **$100**

**UNAUDITED**

---

**Accounting Services**

   The Manager currently employs the services of the firm whose contact information is listed below. The Manager reserves the right to change accounting services as best serves the needs of the Company.

# Miller & Willits Accountants, Inc.
## Certified Public Accountants

Miller and Willits Accountants, Inc. originated in Encinitas, California as a public accounting firm in the 1940's. Although the firm has undergone several name changes, most of the CPA's, professional tax practitioners, and staff have been with the company for more than 20 years.

1012 Second St Ste. 200
Encinitas, CA 92024
Phone: 760-943-2323  Fax: 760-943-2329
www.millerandwillits.com